### EASTMAN *v.* CLARK.

An agreement by which a person is to have a share of the profits of a business, is competent evidence on the question of his liability as a partner in that business; but sharing profits, in any other sense than sharing them as a principal, is not an absolute legal test of his liability.

The question of his liability, is the question whether he is a principal, bound by a contract made by himself, or his agent acting by his authority, or whether he is estopped to deny that he is a principal within the general doctrine of estoppel.

Assumpsit, by Cyrus Eastman against Curtis C. Clark, Damon Y. Clark, and Nicholas T. Stillings, to recover a balance alleged to be due for three hundred and seventy-five bushels of corn sold by the plaintiff to the defendants in the summer of 1864. The two first defendants were defaulted, and Stillings pleaded the general issue.

At the trial, it appeared that in the summer of 1864 the defendants were engaged in running a line of stages between the Crawford house in the White Mountain Notch and the town of Jackson. It was agreed between them that the two Clarks should furnish a coach and two six-horse teams and driver and other appointments for the use of this line, and that Stillings should furnish the same amount of stock; and the parties did so furnish such stock.

There was conflict in the evidence as to the way the teams and other material were to be supported, the plaintiff's testimony tending to prove that the teams were supported at the joint expense of all the defendants, and that the profits of the entire business were divided by the parties, one half to the Clarks and one half to Stillings, while the defendants' testimony tended to prove that each party was to support and maintain his stock at his own expense and not at the joint expense of the three defendants, and that it was so maintained, and that the gross receipts of the business were to be divided between the parties, one half to the Clarks, and one half to Stillings, and that they were so divided.

The court instructed the jury that the defendants would be partners in respect to third persons, whether by the agreement the profits or the gross receipts were so divided, and would be jointly liable for supplies furnished for the business, unless the plaintiffs had notice that there was to be no such joint liability. To these instructions the defendants excepted. The jury returned a verdict for the plaintiff, but, in answer to a question put to them, found that the profits were not divided, but that the gross receipts were divided. The plaintiff's evidence also tended to prove that Stillings expressly authorized Curtis C. Clark to purchase this corn on joint account of the three defendants, and that he did so purchase it; but the jury, in answer to a question put by the court, found that no such express authority was given by Stillings. The defendants move for a new trial for error in the instructions aforesaid, and in case there is error in those instructions, as to the effect of a division of the gross receipts, the verdict is to be set aside, and a general judgment entered for the defendant Stillings. Some time after the jury had retired, they sent to the presiding justice this question: "If the jury find that the Clarks and Stillings divide the gross receipts, does that bind them jointly to the third party?"—to which this answer was made in writing, with directions to return it into court with the other papers: "If the jury find that the Clarks and Stillings ran the staging together upon the agreement to divide the gross receipts between them, they are liable for supplies furnished for that business." The defendants' counsel except to these instructions, because of omitting the qualification that the defendants would be liable

jointly unless the plaintiff had notice that there was to be no such joint liability; which qualification had been before distinctly given. If there is error in omitting this qualification, the verdict is to be set aside,—but no judgment entered for Stillings, unless error is found in the instructions as to gross receipts.

*C. W. & E. D. Rand,* and *Farr & Son,* for the plaintiff.

*H. Bingham,* and *Jackson,* for Stillings.

The case was decided March 17, 1873, by SARGENT, C. J., FOSTER, DOE, LADD, and SMITH, J. J.   HIBBARD, J., not having heard the arguments, took no part in the decision.   The case had been much considered by the court before the decease of Chief Justice BELLOWS, who had made a thorough examination of the authorities, and committed some views to writing, from which the following is an extract:

"It is necessary to understand fully the meaning of the test that has been so long recognized.   It has been announced, in various forms, by eminent judges and text writers, as 'a community of interest in the profits;' 'a participation in the net profits;' 'a participation in the profits as profits;' 'a specific interest in the profits with the right to an account;'—in Collyer on Part., sec. 25 (4th Am. ed.), it is laid down that 'to constitute a communion of profits between the parties, the interest in the profits must be mutual; that is, each person must have a specific interest in the profits as a principal trader;' and the test has been announced in various other forms.   Among all these forms, I think the terms 'community of interest in the profits' express with the most accuracy the meaning which is to be derived from the decided cases.   Of course, it is not to be expected that a rule should be expressed in terms sufficiently concise for practical use, and, at the same time, so comprehensive and accurate as to embrace every conceivable case that may arise under the law of partnership.   It is so with most, if not all, legal definitions; and as occasions arise, the proper qualifications should be made; while, in general, the definition may be sufficiently accurate.

"To constitute a community of interest in the profits, there must be a common interest in them as a principal trader, and as distinguished from a right as a creditor to receive a sum of money out of the profits, or a sum proportioned to the *quantum* of profits, or even a share of the profits as a compensation for service or labor without a specific interest in a lien upon them, or right to any control of the business out of which the profits arise.   Indeed, it would seem to be quite clear that a person connected with a firm in the subordinate capacity of a clerk or servant, and having no voice or control in the management of the business, but bound to obey the orders of his employers, could not be rightfully regarded as a partner, even though he was to receive a share of the net profits as a compensation for his service.   If it be said that he too withdraws a portion of the fund out of which the creditors are to be

paid, the answer is, that he only takes the wages of his labor, the amount of which is made to depend on the *quantum* of profits earned; and, as to the creditors, it stands the same as if the wages were a fixed sum, so long as the arrangement is *bona fide* and not used as a mere cover to protect against liability one who is really a partner.

"One who has this community of interest in the profits, understood in the sense I have stated, is rightfully to be considered as a partner in respect to third persons, even though there be a secret stipulation that he shall not be so considered, and shall not be liable for the debts of trade; and the same fact establishes the relation of principal and agent between him and his partners, and any one who is authorized to bind the firm. He is a partner, and liable to the creditors of the firm, who have no notice that he is not to be bound, even against an express but secret stipulation to the contrary, because he takes part of the fund on which the creditors have a right to rely for the payment of their debts; because those very debts are contracted for his benefit, and the goods or other things for which the debts are created come to his use; because he takes the benefits of the partnership transactions, and therefore ought to bear its burdens, in accordance with the maxim *qui sentit commodum sentire debet et onus* (Broom L. Max. 552, 554, where it is said that the maxim applies in the case of an agreement to share the profits of a concern); because public policy requires such a rule to protect third persons against frauds for which partnerships would otherwise afford a very broad cover and screen (as held in *Atherton* v. *Tilton*, 44 N. H. 452, 457); and more especially because this state of things shows conclusively that the business is carried on in his behalf and for his benefit.

"If, by the agreement, he took all the profits as principal, and not as agent or creditor, I apprehend that no one could doubt his liability for debts contracted by the manager of the business. The rule is precisely the same if he takes one half the profits instead of the whole.

"The community of profits, in the sense I have indicated, constitutes a partnership as to third persons, whatever may have been their secret arrangements."

Jeremiah Smith, J. This is an action of contract. To charge the defendant Stillings in this form of action, it is necessary to show, either an actual contract entered into by him, on such circumstances that the law will, by a fiction adopted for the sake of the remedy, imply a contract " directly against the actual fact."

Upon the findings of the jury, it is clear that there was no actual contract on the part of Stillings to pay for the corn; there was no engagement to that effect signified, either by the words or by the conduct of Stillings. A " contract in fact" can be proved in only three ways. It must appear that the contract was made by Stillings in person, or that it was made by his duly authorized agent, or that he is estopped to deny the agency of the person making the contract. None of these facts exist here. It is not pretended that Stillings made the contract

in person. The Clarks, who did make it, were not Stillings's agents to purchase corn, but were bound, as between Stillings and themselves, to purchase solely on their own credit. Nor is Stillings estopped to deny that they were his agents. It does not appear that he ever held them out, or knowingly permitted them to hold themselves out, as his agents. If Stillings and the Clarks had held themselves out to the plaintiff as partners, and the plaintiff had not known the real terms of their agreement, Stillings would undoubtedly be estopped to deny, as against the plaintiff, that the Clarks had authority to bind him to the same extent that one partner is usually authorized to bind another. But nothing of the kind appears here ; and it is clear, upon the findings of the jury, that Stillings is not chargeable as a contractor in fact.

This conclusion, however, is not necessarily decisive of the present case. If the forms of common law actions were "adapted to the truth of the case," a defendant could not be held liable in an action of contract except upon proof of an actual contract, "either express or tacit." But, by a fiction adopted for the sake of the remedy, the law, in some instances, allows an action of contract to be maintained to enforce a legal obligation or duty which the defendant has never in fact promised to perform. The law, in such cases, "implies a promise," though such implication may be "directly against the actual fact," and even against the party's strongest protestations." See Metcalf on Contracts 5–10, 163, 164 ; *Sceva* v. *True*, Merrimack, June term, 1873. It becomes necessary, therefore, to consider whether justice requires that Stillings, contrary to his actual contract and intention, should be compelled to pay the debts contracted by the Clarks in running their stage. An agreement to share gross returns might be of such a nature as to afford cogent, if not conclusive, evidence *per se* of an intent to defraud creditors. The present, however, is not such a case. It is to be noticed in the outset, that no fraud in fact is imputed to Stillings. There is nothing to show that the plaintiff put his claim on that ground at the trial. For ought that appears, the arrangement was made *bonâ fide,* and there certainly was a valuable consideration. The obvious purpose was to prevent the ruinous consequences of competition. The results do not appear ; but it is by no means improbable that the share received by each party was larger than it would have been if competition had been engendered by the absence of such an agreement. And if either party lost by the agreement, it does not appear that Stillings was not the loser and the Clarks the gainers. The case, then, presents an agreement, made in good faith and for a valuable consideration, which need not necessarily have operated to the prejudice of the creditors of the Clarks, and is not shown to have actually prejudiced them. Yet it is contended that the making and carrying out of this agreement is sufficient cause for holding Stillings liable, "to his last shilling," to pay the debts contracted by the Clarks, notwithstanding the agreement expressly provides to the contrary. This claim is attempted to be supported on the ground that Stillings, by taking a part of the

gross receipts of the Clarks, has taken part of the fund upon which the creditors of the Clarks relied for their payment. It may well be questioned whether there is any foundation for this reasoning, until it is shown that the gross amount of the fares received by the Clarks on their stage exceeded the amount received by Stillings on his stage. If Stillings took two thousand dollars for fares, and the Clarks only fifteen hundred dollars, it is obvious that Stillings, instead of taking from the " fund " of the Clarks, would add two hundred and fifty dollars to it. So, if the fares received by each were equal, Stillings took nothing from the " fund." But, assume that the fares received by the Clarks exceeded by one hundred dollars the fares received by Stillings, and that the Clarks consequently paid Stillings fifty dollars: it may be that Stillings is liable to refund that sum, to be applied in payment of the debts contracted by the Clarks in running their stage. An hostler, who openly labored for the Clarks in taking care of their stage horses, would not be compelled to refund his wages merely because they were paid out of gross returns. All the other creditors of the Clarks know, or ought to know, that the hostler is to be paid out of the fares. It is no surprise to them to find the gross receipts diminished in this way. But these creditors cannot be supposed, in the absence of evidence, to know that an apparently rival line is to receive part of the gross receipts of the Clark stage. Although the engagement with Stillings was in aid of the business of the Clarks, still the existence of such a contract could not ordinarily have been contemplated by third persons giving credit to the Clarks. In the absence of notice of the bargain with Stillings, persons selling grain to the Clarks had a right to suppose that the entire gross receipts to be derived from the Clark stage would belong to the Clarks, and would be primarily liable to discharge debts contracted in aid of the business. Stillings, not having undeceived them by publishing the agreement, may be estopped as against them to deny that the entire gross receipts of the Clarks are primarily chargeable with the payment of these debts. He may be compellable, by appropriate proceedings in equity, to refund the fifty dollars if needed to pay debts of this class, as a legatee may be compelled to refund for the benefit of a creditor of the testator. See 1 Story Eq. Jur., sec. 92. But why should he also be held liable to pay all the debts contracted by the Clarks in this business, which may exceed by a hundred fold the amount received by him and afterwards refunded? Why should the receipt of fifty dollars, which he is compellable to pay back, make Stillings liable for five thousand dollars to the creditors of the Clarks, who did not in fact rely upon him when they gave credit to the Clarks? By the restoration of the fifty dollars, he completely repairs all the injury done by him to the creditors. Why, then, should this extraordinarily severe penalty be visited upon the making of a bona fide agreement, after and in addition to full satisfaction of all the actual damage? Why punish an honest mistake by compelling amends for mischief never done? Such a result seems an unwarrantable extension of the much questioned doctrine of exemplary or

vindictive damages. The mere making of this agreement prejudiced no one, and does not prove an intent to defraud. It is only by the carrying out of this agreement that the creditors of the Clarks are damnified; and the only possible damage to them is the diminishing of the "fund." If that fund is restored whole as at first, what more can they ask? If a thief had stolen fifty dollars from the receipts of the Clarks, he certainly would have taken from the fund on which their creditors relied for payment; but would anybody claim that he was therefore liable to pay all the debts of the Clarks? And, if not, why should this liability be imposed upon Stillings?

If it be argued that it is against the policy of the law to allow a man a chance to share in the receipts of a business without also sharing all its liabilities, the answer is, that the law permits such agreements as the present to have full force and effect when the stipulations are known to those dealing with the parties—see 2 Am. Law Review 7, 8, 202; and the intrinsic justice of this legal principle seems to be recognized by the legislative enactments relating to limited partnerships, "which provide for the public record of the partnership limitations as a method of making them known to third persons;"—see, also, as to statutes, KELLY, C. B., in *Holme* v. *Hammond*, L. R., 7 Exch. 218, p. 227. It is only to *secret* agreements of this nature that objection is made;—see BELL, J., in *Bromley* v. *Elliot*, 38 N. H. 287, p. 303. So far as the creditors have been misled by the secrecy, it is proper that they should be allowed to insist on the rights which they were led to suppose they should have. They may well claim that, so far as they are concerned, the apparent position of the business and the property must be conclusively regarded as the real position. But, after they have been given every right which they had reason to believe they should have, why should they also be given a further right which they never expected, or had reason to expect, and which frustrates the real intention of all parties?

Perhaps it may be objected that it will often be difficult to determine how much the secret sharer has received out of the gross receipts; but the difficulty can be no greater, and would often be less, than that ordinarily incurred in the winding up of a partnership, a matter of common equity jurisdiction, where it is necessary to take an account and decree a division of the surplus. Moreover, it cannot be for the interest of the secret sharer to withhold information as to the amount of his receipts, for all doubts on that point would be construed against him.

Stillings, by taking a share of the gross receipts, has hardly placed himself in the position of a devisee who takes a devise charged by the will with the payment of a certain sum. The charge in the latter case is absolute, irrespective of the value of the devise. Only one inference is deducible from the acceptance of the devisee. He is held liable to bear the entire burden, on the ground that a tacit promise to that effect is fairly to be inferred from his conduct. Here, the charge on the share of the receipts is merely to apply that money to pay the debts of the

Clarks, so far as it will go.  There seems no foundation for inferring a promise on the part of Stillings to pay all the debts.

"It is, we think, too firmly established to be now questioned, that where a person employs another to make a contract of purchase for him, he as principal is liable to the seller, though the seller never heard of his existence, and entered into the contract solely on the credit of the person whom he believed to be the principal, though, in fact, he was not.  It has often been doubted whether it was originally right so to hold; but doubts of this kind come now too late; for we think that it is established law that, if, on the failure of the person with whom alone the vendor believed himself to be contracting, the vendor discovers that in reality there is an undisclosed principal behind, he is entitled to take advantage of this unexpected godsend, and is not put to take a dividend from the estate of him with whom alone he believed himself to be contracting, and to whom alone he gave credit, and to leave the trustees of that estate to settle with the undisclosed principal, subject to all mutual credits and equities between them.  He may recover the price himself direct from the principal, subject to an exception, which is not so well established as the rule, and is not very accurately defined, viz., that nothing has occurred to make it unjust that the undisclosed principal should be called upon to make the payment to the vendor." BLACKBURN, J., in *Armstrong* v. *Stokes*, L. R., 7 Q. B. 598, 603, 604. But this doctrine, relative to charging originally undisclosed principals, does not establish the liability of Stillings in this case.  To lay a foundation for the application of the doctrine, it must first be made to appear that Stillings was a principal in the business of the Clarks.  This is precisely where the plaintiff's case labors throughout.  If, indeed, all that appeared as to the mutual relations was the fact that Stillings was to share in the gross receipts of the Clarks, that fact, standing alone and unexplained, might justify a jury in finding that Stillings was a principal in their business.  But when all the other facts, relative to the agreements and mode of conducting the business, appear, and are viewed, as they must be, in the light of the special findings of the jury, it seems quite apparent that Stillings was not a principal in the business of the Clarks, nor the Clarks principals in the business of Stillings.  On the contrary, the two parties respectively continued to carry on their business on their own behalf alone, although they had bound themselves to pay over a part of what they received.  See 3 Kent's Com., 12th ed., 25, note 1, citing cases of "arrangements for pooling profits."  Various questions may, in other cases, arise as to the practical operation of the rules of law relative to the liability of originally undisclosed principals.  Suppose A employs B to make a purchase in B's name for him (A), upon a secret agreement between A and B that A is not to be responsible to the seller for the price: can the seller, upon subsequently discovering that A employed B to make the purchase, sue A for the price?  Can the limitation, that A was not to be responsible, be held nugatory, as being inconsistent with A's direction to B to effect the purchase?  Or, can the limitation be regarded as

presumptively fraudulent, and hence invalid on that ground ?   See the remarks of BRAMWELL, Baron, in *Bullen* v. *Sharp*, L. R., 1 C. P. 86, pp. 126, 127, quoted in a subsequent part of the present opinion.   In some cases A might, perhaps, be held liable on the ground of estoppel,—as where B is a London broker, and the purchase which A employs him to make is in the ordinary course of brokerage business.   " A broker always professes to make a contract between two principals.   *   *   In every case, therefore, where the sale is to a broker, the vendor knows that there is or ought to be a principal, between whom and himself there is established a privity of contract, and whose security he has in addition to that of the broker; and the principal also knows that the vendor is aware of this, and to some extent trusts to his liability.   This is, therefore, a very different kind of case from that of a person selling goods to a person whom at the time of the contract he supposes to be a principal."   BLACKBURN, J., in *Armstrong* v. *Stokes*, L. R., 7 Q. B. 598, p. 607.   In such a case, A may be regarded as allowing B to hold himself out as authorized to bind the unnamed principal by the contract of purchase.   None of these questions, however, arise in the view that I am disposed to take of the present case ; for I do not regard Stillings as a principal in the business of the Clarks, or as having authorized or employed the Clarks to make the purchase of the plaintiff.

Different opinions have been expressed on the question whether the sharer of gross returns is, by operation of law, liable to third persons as a partner, in spite of an undisclosed agreement negativing such liability.   See 2 Am. Law Review 9, 10, 198 ; Parsons on Partnership 88, note *q.* ; Story on Partnership, 6th ed., sec. 34, *n.* 1; CROMPTON, J., in *Lyon* v. *Knowles*, 3 Best & Smith 556, p. 564 ; MARTIN, B., in *Hickman* v. *Cox*, 3 C. B. N. S. 523, p. 562; instructions to jury by PARKE, B., in *Heyhoe* v. *Burge*, 9 C. B. 431, p. 440.   (Several of the cases sometimes cited on this point were really decided on other grounds ; some of them on the ground that the " sharing " was merely a mode of compensating for services openly rendered.)   The question has not often been fully considered on general principles.   In some instances, the point most discussed is, whether the case of the sharer of gross returns comes within the letter or the reason of a rule of law which has sometimes been supposed to exist in relation to the liability of the sharer of net profits.   It has sometimes been supposed to be the rule of the common law, that one who makes a secret agreement with the ostensible manager of a concern that he shall share in the net profits but shall not be answerable for losses, is, nevertheless, by operation of law, liable as a partner to third persons for all the debts of the concern, although he was never held out as a partner, or relied on as such by those dealing with the concern, and although he has never in fact received any profits. One reason given for the supposed doctrine is, that, if any one takes part of the profits, he takes part of the fund on which the creditor of the trader relies for his payment; or, in other words, that, by taking a part of the profits, he takes from the creditors a part of that fund which is the proper security to them for the payment of their debts.

The question has been raised, whether consistency to the supposed "net-profit rule" requires that a sharer of gross returns should be held to a similar liability.

On the one hand, the letter of "the net-profit rule" has been looked at without regard to its reason. It is said, in substance, that gross returns, though they include net profits, are not literally the same thing; that a participant in gross returns does not participate in profits *as* profits; and that a division of gross returns is only incidentally a division of profits, not a division of profits as such. This reasoning is extremely unsatisfactory.

On the other hand, it is said that the reason of "the net-profit rule" applies with much greater force to the sharer of gross returns. Gross returns necessarily include net profits. If the sharer in net profits takes from the creditors the fund upon which they rely for payment, much more does the sharer in gross returns. And, if taking from the fund is sufficient reason for holding the former liable, *a fortiori*, it is a reason for holding the latter. Net profits "are only to be ascertained after deducting and providing for all liabilities; but the amount of a share in the gross proceeds would be ascertained, and might be taken away as soon as they were received, without providing for the liabilities." See O'Brien, J., in *Shaw* v. *Galt*, 16 Irish Com. Law 357, p. 373.

This train of reasoning appears to be unanswerable.

If, then, the supposed "net-profit rule" is founded in reason and is to be upheld, consistency requires that the defendant Stillings should be held liable. If seems, therefore, hardly possible to avoid meeting, in this case, the question whether the supposed net-profit test, "in its literal and unqualified form," is a sound rule of law, founded in reason. (It is not proposed, in this opinion, to enter upon the inquiry how far the supposed test has ever been actually adopted as the basis of judicial decision.) The intrinsic correctness of the supposed test has been so often and so successfully disputed, that the views now about to be presented are little more than a mere compilation.

One of the principal reasons urged in favor of the supposed doctrine is that already adverted to, viz., that the man who takes part of the net profits, takes part of that fund on which the creditor of the trader relies for his payment. The short answer to this reason is, that it is founded on a false assumption. Creditors neither can, nor do, rely on net profits for payment. Net profits "do not exist until creditors are paid." *Testimony of Commissioner Fane*, quoted in Story on Part., 6th ed., sec. 36, note 3. The very fact that net profits are realized "presupposes that the creditors of the firm are satisfied, or that the partnership assets are sufficient to satisfy their claims." 2 Am. Law Review 195. And if it were possible in the nature of things for creditors to rely on the net profits as a fund for the payment of their claims, it is not probable that they would do so; for they must know that the amount of the net profits would generally be insufficient for that purpose.

Another reason given for this rule is, that if one stipulates for an interest in the profits of a business which would entitle him to an account, and give him a specific lien or a preference in payment over other creditors, giving him the full benefit of the increased profits without any corresponding risk in case of loss, it would operate unjustly as to other creditors.    This reasoning is effectually disposed of by Mr. GRAY, in his notes to the 6th edition of Story on Part., sec. 49, note 2, as follows : " The creditors to whom he is preferred are only the separate creditors of the actual partners ; he has no preference over the partnership creditors, for there are no profits till they are paid, and it is only out of the profits that his remuneration is to come.    Why should the fact that he has a priority over one set of creditors, make him liable ' to his last shilling ' to another set of creditors ?    A second mortgagee has a priority over the mortgagor's general creditors ; but has it ever been argued that *therefore* his whole property, of every kind, should be liable for the first mortgage debt ?    Yet the cases would seem very analogous.    And though a partner is entitled to an account, yet a person may well be entitled to an account and yet not be a partner. If he is to receive a sum equal to a share of the profits, he is, by the great weight of authority, clearly no partner ; yet how can he secure the payment of the compensation agreed upon unless he has an account ? " See, also, 2 Am. Law Review 199.

The argument, that the sharer of the net profits will otherwise receive usurious interest without risk, does not seem very forcible.    Usury is punished by the refusal of the law to enforce usurious contracts, or by the imposition of penalties ; but it is not customary to punish usury by compelling parties to perform contracts which they never made.

The only other alleged reason deserving special consideration at this time is, that the net-profit rule is necessary to " protect third persons against the frauds which might be practised, if *secret* agreements were allowed to be binding on third persons."    See BELL, J., in *Bromley* v. *Elliot,* 38 N. H. 287, p. 303.    It is conceded ᴜ all hands that, so far as the agreement is known, it must be binding oᴜ ᴜll who have knowledge of it — *ibid*, and see 2 Am. Law Review 7, 8, ᴢ02 ; but it is urged that to allow force and validity to a secret agreement would often work a fraud on third persons.    In this view, the liability of the sharer of net profits depends solely upon the secrecy of the agreement.

What are the probable frauds which cannot be remedied save by holding the secret stipulator for a share of the net profits liable to pay the entire debts of the concern, in direct contravention of an agreement that he shall not be so liable ?    If his failure to diᴜ ᴜᴜᴜe the agreement has caused persons dealing with the firm to entertain a reasonable belief in the existence of a certain state of facts, and to act on that belief, he cannot now be permitted to controvert, to the prejudice of such persons, the existence of such facts.    If, for instance, A allows B to hold himself out as the sole owner of a stock in trade, and to gain credit thereby, an attachment of that stock in trade by a creditor of B will not be defeated by proof that the stock was furnished by A, under a secret

agreement between A and B that it should remain A's property. Having knowingly allowed B to gain credit on the faith of his ownership of the stock, A cannot now, as against those who have given B credit, deny that B is the owner. See *Elliot* v. *Stevens*, 38 N. H. 311; *Kelly* v. *Scott*, 49 N. Y. 595. The receipt of *net* profits, while any debts of the concern remain unpaid, seems almost, or quite, an impossibility; but if a person, entitled only to share in net profits, gets hold, by accident or design, of part of the gross returns, he must of course refund them if needed to pay debts; for his own agreement does not authorize him to receive any dividend until all the debts are paid. A secret stipulator for a share of the gross returns would not be thus cut off by his own agreement from retaining such funds; but, as already intimated, he would be quite as effectually barred by the application of the principles of estoppel. If A allows B to hold himself out to the world as the sole owner of the gross returns of a business, A cannot withhold a portion of those gross returns from the creditors who were thus led to trust B. He is estopped from showing a different state of facts from that which his silence induced the creditors to believe in. But the doctrine of equitable estoppel is remedial, not vindictive. The estoppel will not be carried further in any case than is necessary to prevent one party from being injured by his reliance upon the conduct of the other. 2 Smith's Lead. Cases, 5th Am. ed., p. 644. It is enough to put the party misled in the position he would have been in if the representations actively or passively made by the other party had been true in fact. If B has never allowed himself to be held out as personally liable for debts contracted by A, and the creditors of A have had no reason to rely and have not relied on B's security, why should B be estopped from showing that he is not liable? "A is not the agent of B; B has never held him out as such; yet C is entitled, as between himself and B, to say that A is the agent of B! Why is he so entitled if the fact is not so, and B has not so represented?" If C, knowing of an agreement between A and B that B shall not be liable for debts contracted by A, deals with A, he has no claim on B. "Why should he, if he does not know of it? Why, upon finding out something between A and B which has in no way affected or influenced him, should he who has dealt with A have a claim on B," contrary to the intention of both A and B? See BRAMWELL, B., in *Bullen* v. *Sharp*, L. R., 1 C. P. 86, pp. 125, 126. If the only objection to these agreements is the secrecy, is it not enough to compel the reparation of all damage caused by the secrecy? Because B has caused C to believe in the existence of a certain fact, shall B therefore be estopped to deny the existence of an entirely distinct fact, in the existence of which C never believed? Why should the law impose upon B the performance of a duty which he never undertook, and which C never supposed he had undertaken? A strong argument against the supposed "net-profit rule" is afforded by the claim to which it legitimately gave rise in *Kilshaw* v. *Jukes*, 3 Best & Smith 847. Kilshaw supplied timber t Till & Wynn for houses which they were building. Till & Wy

offered Jukes as a guarantor for the price of the timber, but his security was rejected by Kilshaw. Kilshaw, subsequently, having, as he thought, discovered that Jukes was a participator in the net profits of the house-building, sued him as a copartner,—thus, in effect, attempting to enforce payment from a man on whom he never relied, and whose guaranty he had expressly refused! Yet, if Jukes had in fact participated in the net profits under an agreement that he should not be liable for debts, we think Kilshaw's claim might well have been supported under the supposed " net-profit rule."

The maxim, " *qui sentit commodum sentire debet et onus*," is not decisive in favor, of the supposed rule. It must be presumed that the secret stipulator for a share of the net profits gives something for the right. (If he does not, there is no consideration, and hence no valid agreement.) If he does pay anything to the ostensible manager, or puts any capital into the concern, he does " bear a burden ; " he runs the risk of losing what he thus pays or puts in. His claim is not enforceable until after all the creditors of the concern are satisfied. Furthermore, notwithstanding this maxim, an agreement to share profits without being liable for debts is not in its nature against the policy of the law. This, as has already been 'said, is evident from the fact that such agreements, so far as they are known to persons dealing with the concern, are allowed full scope and effect. See 2 Am. Law Review 7, 8, 202 ; *Bailey* v. *Clark,* 6 Pick. 372 ; BELL, J., in *Bromley* v. *Elliot,* 38 N. H. 287, p. 303.

" It may be said that if this reasoning is right, a man might bargain to receive all the profits of a business and not be liable. The answer is, the thing is impossible. There never was, and never will be, a *bona fide* agreement by one man to carry on a business, bear all its losses, and pay over all its profits. Should such an agreement appear, it would obviously be colourable." BRAMWELL, B., in *Bullen* v. *Sharp,* L. R., 1 C. P. 86, pp. 126, 127. In other words, it would be almost impossible to satisfy a jury that even the form of such an agreement was ever entered into ; and, if that fact should be established, the mere making of such an agreement would, under ordinary circumstances, afford cogent evidence of an actual intent to defraud creditors. And participators in that intent would in some form of action (whether in contract or tort is not now material) be held answerable to make good the loss of all who suffered by the conspiracy. We are dealing here only with *bona fide* agreements. Colorable arrangements will be attempted under any rule or test.

The supposed " net-profit rule" is not needed to reach the case of an ostensible partner. He is liable on the elementary principles of the law of estoppel, because he held himself out as a partner. Nor is it needed to reach the case of a dormant partner who was to participate in the profits and the losses. He is liable, just as any other undisclosed principal is, under the ordinary doctrines of the law of agency. In such a case " the dormant partner knows he is liable, and means to be." BRAMWELL, B., in L. R., 1 C. P., p. 126.

Nor does the repudiation of the supposed rule annihilate the ordinary presumptions of fact. If it appears that B. stipulated for a share in the profits of a concern, a jury fairly may, and always will, presume, in the absence of any evidence to the contrary, that he also agreed to be liable for the losses. That is the *prima facie* inference, justified by common experience. But the supposed " net-profit rule " goes further, and conclusively presumes that he contracted to pay the debts, in the face of satisfactory evidence that it was expressly stipulated to the contrary. It does not allow him to rebut the presumption. In every case where there is an agreement to participate in the net profits, there is incidentally and to a limited extent a participation in the losses as well as in the profits; for, before it can be ascertained that there are any profits, the losses must first be deducted, and the residue only shared as profits. See Story on Part., sec. 60. But, because a man has subjected himself to this incidental sharing of the losses, why should the law conclusively presume him personally liable to respond for all losses out of his general property ?

It is not the least of the objections to the supposed rule, that the hardship of its application to individual cases will lead to the introduction of subtle exceptions to the rule, exceptions " which aggravate the bulk of the *Corpus Juris*, and (what is an evil of still greater magnitude) which reduce the body of the law to a chaos of incoherent details." See 1 Austin on Jurisprudence, 3d ed., 483.

In truth, " the law as to partnership is undoubtedly a branch of the law of principal and agent; and it would tend to simplify and make more easy of solution the questions which arise on this subject, if this true principle were more constantly kept in view." Lord WENSLEY-DALE, in *Cox* v. *Hickman*, 8 House of Lords' Cases 268; S. C., 99 Eng. Com. Law 47, pp. 98, 99. The same great judge said, nearly twenty years earlier,—" All questions between partners are no more than illustrations of the same questions as between principal and agent." PARKE, B., in *Beckham* v. *Drake*, 9 M. & W. 79, p. 98. See *Cox* v. *Hickman*, 8 House of Lords' Cases 268; S. C., 99 Eng. Com. Law 47; *Bullen* v. *Sharp*, L. R., 1 C. P. 86; *Re English & Irish Church & University Assurance Society*, 1 Hemming & Miller 85; *Shaw* v. *Galt*, 16 Irish Com. Law 357, p. 375; *Holme* v. *Hammond*, L. R., 7 Exch. 218; *Kilshaw* v. ᴗ ᵌs, 3 Best & Smith 847; Story on Partnership, 6th ed., sec. 49, note ⅃; cases of " arrangements for pooling profits," cited in 3 Kent's Com., 12th ed., p. 25, note 1.

The real and ultimate question in all cases like the present is one of agency. Did the person sought to be charged stand in the relation of principal to the person contracting the debt? Participation in the profits is not decisive of that question, " except so far as it is evidence of the relation of principal and agent between the persons taking the profits and those actually carrying on the business." Whether such relation existed is a question of fact. Upon the trial of that question, proof of a right to participate in the profits would be a cogent, and often practically conclusive, piece of evidence to establish the existence

of that relation; but there is no sound foundation for an arbitrary rule of law requiring courts or juries to regard participation in the profits as a decisive test which will in all instances necessitate the conclusion that the participator is liable for the debts.

Undoubtedly, in a great majority of cases, persons who would be held liable under the supposed "net-profit test," will also be found liable under what I view as the true test. But the present case affords evidence that the difference between the two tests is substantial, and not merely verbal. It is to be borne in mind that, in what has here been said as to the supposed "net-profit test," reference is made solely to that test in the "literal and unqualified form" in which it is stated in a previous part of this opinion. Whether the test, in that form, has ever been adopted as the basis of judicial action, it is not my present purpose to inquire. The intrinsic correctness of the supposed test is the only point intended to be here discussed.

Upon the foregoing views, the literal terms of the reserved case would justify the court, not only in setting aside the verdict for the plaintiff, but also in rendering judgment for the defendant Stillings. But I am inclined to give the plaintiff another opportunity to try the case upon the facts, in the light of the opinion now expressed as to the law. There is some reason to believe that, at the late trial, the plaintiff's counsel and the presiding judge both assumed the "net-profit test" to be unquestionable law; and that this position was not seriously controverted by the defendants' counsel. If the "net-profit test" were law, logical consistency would, as has already been said, require that Stillings should be held liable here upon the admitted facts of the case. Under the misconception as to the law, which seems to have been tacitly adopted by all parties at the trial, the plaintiff's counsel might have supposed themselves sure of success on the admitted facts, and thus have failed to present their case fully on the controverted facts. It is conceivable that the plaintiff's counsel might have made a stronger case as to the authority in fact given by Stillings to the Clarks, or that they might have introduced evidence on the question of estoppel, if they had understood how essential it was to succeed on one or the other of these issues of fact. Under all the circumstances, I am disposed to give the plaintiff another opportunity to try the questions of fact,— although, if the findings at the new trial are like those at the former trial, the defendant Stillings will, in my opinion, be entitled to judgment. The verdict should be set aside.

DOE, J. When Judge STORY had written his treatise on agency, he began his commentaries on the law of partnership thus: "Having completed our review of the law of agency, we are naturally conducted, in the next place, to the consideration of the law of partnership; for every partner is an agent of the partnership, and his rights, powers, duties, and obligations are, in many respects, governed by the same rules and principles as those of an agent. A partner, indeed, virtually embraces the character both of a principal and of an agent. So far

as he acts for himself and his own interest in the common concerns of the partnership, he may properly be deemed a principal; and, so far as he acts for his partners, he may as properly be deemed an agent." Story on Part., sec. 1.

"The authorities are uniform in maintaining the doctrine that, where the principal is unknown to the vendor at the time of a sale, he may, upon discovering the principal, resort to him for payment, although, in the absence of such knowledge, the credit may have been given to the agent alone, and his individual note alone have been taken for the debt. Story on Agency 291; *Paterson* v. *Gandasequi*, 15 East 62; *Raymond* v. *Crown & Eagle Mills*, 2 Met. 324; *Thomson* v. *Davenport*, 9 B. & C. 78. The same principle, which seems to have been uniformly applied to the case of principal and agent, is equally applicable to that of an individual partner and his firm. Each partner is an authorized agent for the firm; and if the individual partner obtain money or goods on his own credit for the use of the firm, without disclosing the interest of the partnership in the transaction, the debt contracted is the debt of the firm, notwithstanding the note of the individual partner alone may have been given and taken therefor." *Tucker* v. *Peaslee*, 36 N. H. 167, 176; *Farr* v. *Wheeler*, 20 N. H. 569, 575. "As the defendants were partners, they were both liable to the plaintiffs, notwithstanding at the time of the sale the plaintiffs supposed that they were giving credit to Smith only. In purchasing the goods, he was the authorized agent of the copartnership, * * and the plaintiffs * * may well sustain an action against those who were in truth the purchasers. *Smith* v. *Smith*, 27 N. H. 244, 253.

When A authorizes B to make a contract in his behalf, the contract is, in a certain sense and for some purposes, the contract of A. In contemplation of law he makes it. Whether he makes it personally, by the exercise of his own mind, hand, or voice, or instrumentally by the mind, hand, or voice of his agent B, is immaterial so far as his own liability is concerned. He is as much the principal in one case as in the other. So he is equally a principal whether he is sole principal and B his agent, or whether B is a joint principal with him as well as his agent. If they are partners, B makes the contract as a principal, and also as agent of A. If we say he makes it as an agent of the firm, we mean that he makes it as agent of A, and also as agent of himself. And as the contract is equally A's contract, whether B is merely his agent, or his agent and also a joint principal with him, so in each case A is equally bound, whether he is or is not known to the other contracting party to be a principal. The cases in which A is not liable because the other contracting party, knowing him to be a principal, elects not to contract with him, stand upon the ground of the election thus made by the other party. Without reference to that exceptional class of cases, and with sole reference to the general question raised in this case, if B is agent, A is liable because he is the principal: if B is a joint principal as well as agent, A is liable because he is a principal: if A is known to the other contracting party to be a principal, he is

liable because he is a principal: if he is not thus known, he is liable because he is a principal.

In the case supposed by Brother SMITH *(ante,* pp. 286, 287), where A employs B to make a purchase in B's name for him (A), upon a secret agreement between A and B that A is not to be responsible to the seller for the price, a difficulty arises from an ambiguity in the terms, "A employs B to make a purchase in B's name for him (A)." If this means that A is the principal and B his agent, A is liable because he is the principal. *Edmunds* v. *Bushell*, L. R., 1 Q. B. 97. If it means that B, as principal, is to buy the property of C, and then sell it to A, A is not liable to C because he is not the principal. The question of A's liability is the question whether, in the contract of purchase from C, A is in fact the principal and B his agent, or whether B is the principal, who, after he has bought the property of C, is to sell it to A; whether the title passes directly from C to A, or from C to B and from B to A; whether there are to be two successive purchases of the same property, or only one; whether (in the contract of purchase from C) A or B is the purchaser. This depends (so far as A's liability is concerned, and aside from fraud and estoppel) upon the understanding between A and B. If they understand the title passes directly from C to A, and not through B as an intermediate purchaser, A is the principal, B is his agent, and A, as the purchaser, is bound to pay C for the property which he buys of C. A's denial of the fact that he is the purchaser, has no more effect than his denial of any other fact; an agreement between him and B to deny the fact, does not alter the fact; A, being the purchaser, is responsible as the purchaser for the price; he is liable upon the fact, and is not discharged from his liability by an understanding between him and his agent that the fact should not be disclosed or should be denied. A purchase of goods is a sale; and a sale is something more than the vendor's parting with his property. It includes payment made, promised, or in some way provided for by the other party to the contract. The buyer, *i. e.,* the principal who buys, is necessarily a payer, unless the vendor agrees he shall not be. If the agreement between A and B is made known to C during the negotiation, and he expressly or impliedly agrees not to look to A for payment, he is bound by his agreement; but he is not bound by a secret agreement between A the purchaser and B the purchaser's agent, that A is not to pay C for property bought by A of C. When C discovers that A is the buyer, he is not deprived of all the benefit of that fact by the undisclosed agreement *inter alios* that A is not to pay for what he buys. That agreement does not make the agent B the purchaser in fact, nor relieve the purchaser A from his part of the contract of purchase made with C. The agent, holding himself out as the purchaser, is estopped to deny, as against the vendor C, that he is the purchaser. But the secret agreement between the real purchaser and his agent, that payment is to be made by the latter and not by the former, is no part of the contract of purchase: it is merely an extraneous executory agreement *inter alios* to which the vendor is not a party.

C is a party in the contract of purchase; and if A is the purchaser, he is liable to C because he is the purchaser. The fact that he is the purchaser is the material thing; the non-disclosure of that fact, so far as his liability is concerned, is immaterial; his intention not to pay is as immaterial as it would be if he had held himself out as purchaser, and had omitted to disclose the fact that he intended not to pay.

The question whether A is a principal and B his agent, that is, whether A authorizes B to make the contract in his behalf, is often a difficult question of fact. And if B is a principal, the question whether A is a principal is the same, and may be as difficult, as it would be if B were not a principal. If B is a principal, the question whether A is a principal is called a question of partnership: if B is not a principal, the question whether A is a principal is called a question of principal and agent, or agency. The legal character of the question whether A is a principal, is not altered by the circumstance that B is or is not a principal, nor by the circumstance that it is called in one case a question of partnership, and in the other a question of agency. And as that question is not affected by the name given it by the tribunal called upon to decide it, so it does not depend upon the name given it by A or B, or both of them. Through all forms and words, all arrangements simple or complicated, all pretences true or false, all contrivances honest or fraudulent, the law requires the tribunal to search for the substance, the meaning, the understanding, and the fact; and this duty is the same whether B is a principal or whether he is not.

Not only is A liable as a principal when, as a matter of fact, he is a principal, whether B is or is not a joint principal with him, and whether A is or is not known by the other party to be a principal,—he may also be liable when, as a matter of fact, he is not a principal. The common-law rule, generally called the doctrine of estoppel, is applicable, and is applied to the liability of A as a principal in a contract made by B. If B is held out by A, or by his direction or consent, as his agent, A is liable as a principal: he is estopped to deny the existence of the state of things which he directly or indirectly induces another, or causes another to be induced, to believe in and act upon. Though not a principal in fact, he is a principal in contemplation of law, because he is estopped to deny that he is a principal. Being estopped in law to deny that he is in fact a principal, is, so far as liability to creditors is concerned, practically the same as being a principal in fact. Causing another to act upon the belief that he is a principal, and that B is authorized to make a contract in his behalf, that is, is his agent for that purpose, he is estopped to deny the existence of the relation of principal and agent between himself and B,—in other words, is estopped to deny B's authority,—without regard to the question whether B is or is not a joint principal or copartner. The estoppel operates in the same manner and with the same result, whether B is an agent merely—*Hatch* v. *Taylor*, 10 N. H. 538; *Towle* v. *Leavitt*, 23 N. H. 360, 374—or an agent and also a joint principal. *Smith* v. *Smith*, 27 N. H. 244, 252. · If A holds B out, or authorizes B to hold himself

out, as his agent, the circumstance that B is or is not a principal, is immaterial in the application of the doctrine of estoppel to A.

Here are two general elementary doctrines of the ancient common law, holding A liable as a principal on a contract made by B :—1. The doctrine of the liability of an actual principal, disclosed or undisclosed ; 2. The doctrine of estoppel, which under certain circumstances makes a man a principal in law when he is not a principal in fact. The latter doctrine, applied to this subject, is merely one of the methods of ascertaining whether A is a principal. Both doctrines constitute the single doctrine of the liability of a principal. If A is in fact a principal, he is liable because he is a principal : if by the process of estoppel in law he is a principal, he is liable because he is a principal. And each of these doctrines or parts of a single doctrine has a legal operation and effect irrespective of the question whether B is or is not a joint principal or copartner with A. The application of these doctrines to the question of A's liability does not render it necessary to determine whether the question is one of agency or partnership, that is, whether B is as agent merely, or an agent and also a principal, because, whether B is or is not a principal, A is equally and for a single reason liable as a principal disclosed or undisclosed, and is equally and for a single reason estopped to deny that he is a principal. He is liable because he is a principal, or because he holds himself out or suffers himself to be held out as such. He is none the less nor for a different reason liable when, B being a principal, the question of A's liability is called a question of partnership : he is none the more nor for a different reason liable when, B not being a principal, the question of A's liability is called a question of agency : and the test of his liability is not more ambiguous nor anywise different when, it being uncertain whether B is or is not a principal, it is consequently uncertain whether the question of A's liability is to be called a question of partnership or a question of agency. If it is never settled whether B is a principal, and it is consequently never known by which of its possible names the question of A's liability is to be called, that question can be settled notwithstanding it is an anonymous one ; and it must be settled on the same legal grounds as if its name were known. So far as the general legal test of A's liability is concerned, the two names of the question are synonymous. These legal rudiments every one expresses in language most satisfactory to himself. There is a choice of words. For instance, when B is a principal, and the question is whether A is liable as a copartner or joint principal with him, some may use the word "partner," and others may prefer the word "principal :" whichever term is employed, the same thing is meant, and the same idea is accurately conveyed. But the use of some words in indefinite, ambiguous, and opposite senses has involved the authorities in some apparent uncertainty and confusion. When A and B are not partners in fact, but are liable to certain creditors as partners in law by estoppel, they are partners as to those creditors, though not partners as between themselves : but the phrase " partners as to third persons though not partners *inter*

*sese,* as sometimes used, signifies not " partnership by estoppel," but something too vague and visionary to be understood or discussed. " Profit," " profits as profits," " profits as such," " profits not as profits but as something else," " a share of the profits," " a community of interest in the profits," " a specific interest in the profits as a principal trader," " a specific interest in the profits with the right to an account," " a specific lien upon the profits," " taking part of the fund on which creditors rely for payment," " jointly concerned," and other common expressions relating to partnership liability, have, in the absence of clear, precise, and fixed definitions, become a cause of perplexity. We need not dwell upon the many significations of " profit," or on any distinction between the uses of the word in political economy and in law. Story on Part., sec. 21, *n.* 1. For our practical purpose, a single illustration will suffice. Suppose B, going into the retail flour trade with no capital, hires A as clerk for one ninth of the profit, buys 1,000 bbls. of flour of C at $10 a bbl., sells it all at $11 a bbl. in one month, in a store hired of D at $100 a month, and the business is then closed. A, C, and D having received nothing, and B having the $11,000, $10,000 of that sum is to be paid to C for the flour. The remaining $1,000 is the primary, gross, or sale profit. Deduct from that gross profit the $100 due D for rent, and we have $900, the profit out of which the deferred creditor A is to be paid for his services as clerk. Deduct from that deferred creditor fund one ninth of it due A, and we have $800, the final or net profit of B the principal. Until they are paid, A, C, and D are creditors. C and D stand on an equal footing as ordinary creditors : the fact that, in book-keeping, the debt to D for rent may be recorded in the expense account does not affect its existence as a debt : the debt to A for services may be recorded in the same account. C and D are general, absolute creditors, relying for payment on everything until they are paid : then, ceasing to be creditors, they rely for payment on nothing. A is a deferred and contingent creditor, entitled to nothing until C and D are paid, and then entitled to nothing unless some of the gross profit is left. C and D, until they are paid, rely for payment on the whole of B's property,—upon the $1,000 gross profit, as well as the rest of the proceeds of the flour. They do not rely on what may be left after they are paid. They do not rely on the $900 (deferred creditor fund) left after they are paid, nor on the $800 (net profit) left after payment of all creditors, general and deferred.

If C is first paid, he takes part of the fund on which D relies for payment : if D is first paid, he takes part of the fund on which C relies for payment : but the one first paid does not, by the act of receiving payment, become liable to the other for taking part of the fund on which they both rely. That is not the fund of which A is to have one ninth ; and he is not liable to C and D for not taking a share of the fund on which they rely. The fund of which A is to have one ninth is the $900 left after C and D are paid : on that fund C and D do not rely ; and A is not liable to them for taking a part of the fund on which they do not rely. He is a creditor, though a deferred one ; and, as

creditors, C and D do not become liable to each other or to A by properly receiving payment out of the fund on which they properly rely for payment, so A does not become liable to them by receiving payment out of the fund on which he relies.

But if A, as a joint principal and copartner, and not as creditor, is entitled to one ninth of the profit, it is net profit that is meant; and if he is entitled to a part of the net profit, he is liable to C and D, not because he is entitled to a part of the fund on which they rely,—for they do not rely on the net profit; he is liable to them because he is a principal. If he is a principal, " the profit " of which he is to have a part means the balance of gross profit left after paying all creditors : if he is a creditor, " the profit " means the balance of gross profit left after paying all creditors but himself. Whether, in a particular case, " the profit " carries the one meaning or the other, depends on the question whether he is a principal or a creditor, which is the first, last, and only question in the case. We cannot know in what sense " the profit " is used by the parties until we discover whether A is a principal or a creditor. How can that be a method of answering a question, which is a deduction from the answer, and cannot be known until the answer is obtained ? If A is a creditor, he is none the more and none the less a creditor by reason of his being entitled, as a creditor, to one ninth of " the profit : " if he is a principal, he is none the more and none the less a principal by reason of his being entitled, as a principal, to one ninth of " the profit." When A and B agree that A shall have one ninth of " the profit," they may mean that he is to have it in the capacity of, and by virtue of his being, a creditor : they may mean that he is to have it in the capacity of, and by virtue of his being, a principal. The question is, Which do they mean ? The sharing-profit test merely repeats that question without answering it. As A may be entitled to one ninth of a fund called " profit," either in the capacity of a creditor or in the capacity of a partner, his ambiguous right is not a test of the capacity in which he holds it. Taking part of " the profit " is no more the test of his being a partner than it is the test of his being a creditor.

In the supposed case, where A is a creditor and not a partner, there are three different profit funds, or one profit fund of three different amounts and with three different names,—1, $1,000 gross profit, out of which, as well as out of the other $10,000, proceeds of the flour, the general creditors are to be paid ; 2, $900 deferred creditor fund left after payment of the general creditors C and D ; 3, $800 net profit, left after payment of the general creditors C and D, and the deferred creditor A. An agreement of A and B that A is to have one ninth of the profit, means either that A is to be a deferred creditor entitled to one ninth of the gross profit left after payment of the general creditors as compensation for his services, or that he is to be a joint principal and copartner with B, entitled to one ninth of the net profit. In the former case, " the profit " means neither the gross profit nor the net profit, but the $900, of which the $800 left after payment of A is the net profit of

the business in which B is sole principal: in the latter case, "the profit" means the $900 net profit of the business in which A and B are joint principals. The difference is, not in the amount which A is to receive, but in the capacity in which he is to receive it. In the one case, as a clerk hired by B, and as a creditor of B, he is to receive from B, in payment of his deferred debt, one ninth of the amount of B's gross profits left after payment of other creditors: his right is a chose in action, not a thing actually or constructively in his possession: the title of the ninth is in B, and not in A, until he is paid;—in the other case, as a joint principal, before he receives his share, he owns, in common with B, the net profit left after payment of all partnership creditors of A and B: the title is in A and B: A owns one ninth, and B owns eight ninths. In the one case, the net profit is $800: A is a creditor of B, and not a principal: B owes him $100 for wages which he can recover in assumpsit at common law;—in the other, the net profit is $900: A is a joint principal and not a creditor: B owes him no wages: their net profit cannot be ascertained and divided in a common-law action: for the debts contracted by B, within the scope of his authority as agent in earning that net profit, A would be liable, did not the existence of net profit show that those debts have been paid.

If A is clerk and creditor, he receives $100, not as his share of the profit of a business in which he is a joint principal, but as compensation for his services in a business in which B is sole principal: he receives one ninth of the profit, not as profit, but as payment of a debt. If A is a principal, he owns one ninth of the profit as profit, and does not receive it as payment of a debt. The distinction between taking profit as profit, and taking it not as profit but as payment of a debt, is a familiar one, firmly established by the authorities, but not always explained as clearly as it might be. It is the distinction between a partner and a creditor obscurely expressed. Taking a share of the profit as profit, is taking it as his profit—as the profit of his flour business—as the profit of a principal,—taking it in the capacity of a principal trader —an owner of the profit—a partner: taking a part of the profit as payment of a debt, is taking it in the capacity of a hired man or other creditor. If A is clerk and creditor, we mean by his share of the profit what is his when it is paid to him by his employer, but, until then, is his in a figurative sense only. If he is clerk and creditor, what is called his share of the profit belongs, as a matter of absolute legal title, exclusively to B until he pays it to A, and then belongs exclusively to A: it does not, at any time, belong to A and B in common, or in any manner indicated by the ordinary signification of the terms " share of a partner." But, if A is a joint principal, " his share " is " the share of a partner " in the net profit. The indiscriminate use of the word " share," signifying the amount of his wages and debt if he is a clerk and creditor of B, and signifying his ownership of a part of the profit in common with B, if he is a principal, is a cause of confusion. The distinction between the two significations of " share," is the distinction between a creditor and a partner.

"Jointly concerned in a transaction,"—*Brown* v. *Cook*, 3 N. H. 64,—and other explanatory terms often used to describe the relation of co-partners, may be useful for that purpose. In this case, the jury might be properly instructed that all the defendants were liable if they were "jointly concerned" in the contract made by one of them with the plaintiffs. The judge need not confine himself to the word "copart-ners;" he may say "joint principals:" all the defendants were "joint principals" if they were "jointly concerned" in the contract as the parties to it on one side,—as the purchasers of the corn,—as the joint owners of the corn to whom the title passed from the plaintiffs. "Jointly concerned," if it means all that, means "joint principals:" if it means anything less it is not a useful definition, but something that needs defining, and is of no use until it is defined. And the same is true of "a community of interest" in profits or other property, or in any contract or business. If "joint concern" and "common interest" are used as synonymous with the relation of "joint principals," and if they are so understood, it is immaterial which form of expression is employed: but such terms used (as they often are) in a vague, unde-fined, and undefinable sense, cannot be accepted as a test of anything. What is wanted is, not a new legal language, but an accurate use of the old; not a novel doctrine, but a clear understanding of what is settled.

If A, by agreement with B, is to have "a share of the profit," meaning a part of the profit left after the payment of all debts, he is necessarily a principal, because he is either a principal or a creditor; and a creditor cannot be entitled, as a creditor, to a part of what is left after he is paid. Whether he is a principal or a creditor depends upon the agreement between him and B. If they agree he shall have a part of "the profit," what do they mean by "the profit"? If they mean the profit left after the payment of all creditors, they mean that A is not to be one of those creditors; and, not being a creditor, he must be a principal. But how are we to know whether they mean "the profit" in that sense, until we ascertain whether, in their meaning, A is to be one of those creditors whose payment is the prerequisite and test of "the profit" in that sense? Put this in what form we may, it is all a reasoning in a circle, or a begging of the question, or a substitution of one of two synonymous questions for the other.

What difference whether A is to receive one ninth as wages, or horse hire, or store rent, or interest of money loaned? How can a debt due him for one thing make him a creditor, and a debt due him for another thing make him a partner? What he is to receive as compensation for his own work or the work of his horse, for the use of his store or the use of his money, for knowledge and skill sold to B or for goods sold to B,—what he is to receive in the capacity of a creditor he is not to receive in the capacity of a partner. All this is merely saying, if he is a creditor, he is a creditor; if he is a partner, he is a partner. The question all the time is, whether he is a creditor or a partner; and to say the question is, whether he is to receive a part of the profit in the

one capacity or the other, is, not to invent a test for ascertaining the
answer of the question, but merely to state the question in a form that
involves it in some obscurity.    Is he a creditor, or a partner?    That is
the original question.    Amend that question by inserting in it the so-
called sharing-profit test, and the remodelled question is, Is he to receive
a part of the profit in the capacity of a creditor, or in the capacity of a
partner?    The experiments of ninety-eight years have failed to show
that the verbal alteration is an improvement, or that it has any other
effect than to bewilder the inquirer who starts with the supposition that
it means something.

In the supposed case, A is either a creditor or copartner of B.    He
is to receive a part of what they call "profit," in the capacity either of
creditor or partner.    The combined authorities establish a sharing-
profit test in this sense: if A is to have something in the capacity of a
creditor, he is a creditor; if he is to have it in the capacity of a partner,
he is a partner.    The discussions of the last ninety-eight years began
with that; and they have ended where they began.    The difficulty now is,
not to ascertain the result, but to discover what disputed point was
supposed to be involved in the debate,—a difficulty not unfrequently
found at the close of protracted controversies.

"Sharing profits," with the qualification " as a principal and not as a
creditor," is useless as a legal test, because the qualification is a mere
repetition of the question for the solution of which a test is sought:
without that qualification it is useless because it is equivocal.    In its
literal and unqualified form, as shown by my Brother SMITH, it is not
consistent with, and cannot be founded upon, the general rules of law.
If in that form it could be and were a test, it would exist as the creation
of arbitrary and absolute authority.    In examining the authorities, it
is an advantage to begin with the supposed test wholly severed and
detached from dim and indeterminate generalities, and placed apart by
itself in contrast with the primary principles upon which the law of
partnership liability is based.    If we find an authority urging that an
undisclosed principal or secret partner should be liable, we know that
is accomplished without a sharing-profit test: if we find an authority
working out a liability by estoppel, we know a sharing-profit test in
that matter is irrelevant.    If we find authorities apparently presenting
or recognizing a sharing-profit test, the first question will be, In what
sense is the test announced, and what is the meaning and effect of its
exceptions and qualifications?    If, upon a careful scrutiny, the so-called
test of sharing profits, enveloped in and consolidated with its mass
of exceptions and qualifications, when compared with the elementary
doctrine of the liability of a principal disclosed or undisclosed, is found
to be nothing more than a badly executed copy or paraphrase of that
doctrine, or a *fac-simile* in disguise, the question in this case will be
reduced to one of those contentions about words, which is not a legal
controversy.

It has been supposed that a sharing-profit test, with divers exceptions,
qualifications, and explanations, was, at one time, established by the

authorities. It has been supposed that it was established in England in the latter part of the last century; that it was settled in the class of cases generally ranged under the leading case of *Waugh* v. *Carver; that* it was upheld until 1860, and that it was then overthrown by the decision in *Cox* v. *Hickman. Cox* v. *Hickman,* and the subsequent English cases, maintain that there is no such test; that the question of partnership liability is a question of the liability of a principal; that, so far as it is a question of law, it is governed by the general doctrines called law of agency or law of principal and agent when applied in a case of an agent and one principal, and called law of partnership when applied in a case where the agent is a *joint principal;* and that, so far as it is a question of fact, sharing profits is evidence tending to show that the sharer is a principal. From 1860 to the present time, that has been held to be the common law of England. But what was the meaning and effect of the English cases before 1860? This is an important question, for this reason among others, that, before 1860, the American authorities were generally intended to be a mere following of the English; and when we ascertain the meaning and effect of the English cases before 1860, we shall learn what the mass of American authorities were intended to be.

The civil law seems to have been largely the source of the common law of partnership; and it is agreed, by competent persons who have made due investigation,—Story on Part., secs. 37, 50, 51, 62; Parsons on Part. 88; 2 Am. Law Rev. 6, 7,—that the authorities of the civil law do not contain a sharing-profit test of partnership liability. No one seems to have supposed that such a test came into England from the continent. If it had been a rule of the civil law, that fact would probably have been discovered in the researches, and asserted in the discussions that have occurred in England during the last thirteen years. The English cases on the subject begin in 1775; at least, none have been found of an earlier date. They do not refer to such a test as a civil law doctrine adopted in England, or as having been in any way established or recognized by any common law authority before 1775. We may safely conclude that, if there is such a test, it originated in Westminster Hall, and was not fabricated before 1775. And, as nearly if not quite all the important common law rules that have been introduced within the last hundred years can be traced to the time and place of their origin by authentic records, and as a sharing-profit test, if it ever existed, has been introduced within that period, we should expect to find, with a satisfactory degree of certainty, when, where, and by whom it was introduced, on what occasion, under what circumstances, for what purpose, in what signification, and with what exceptions, qualifications, and explanations.

Of *Bloxham* v. *Pell,* a *nisi prius* case, we find an account in *Grace* v. *Smith,* 2 Wm. Bl. 998, 999. It was tried before Lord MANSFIELD, in the King's Bench, at the same sittings at which *Grace* v. *Smith* was tried before DEGREY, C. J., in the common pleas, March 7, 1775. Pell and Brooke had entered into a partnership for seven years, but at the

end of one year agreed to dissolve it, but no express dissolution was had. The agreement to dissolve recited, that Brooke being desirous to have the profits of the trade to himself, and Pell being desirous to relinquish his right to the trade and profits, it was agreed that Brooke should give Pell a bond for £2485, which Pell had brought into the trade, with interest at 5 per cent., which bond was accordingly given; and it was further agreed that Brooke should pay to Pell, in addition to 5 per cent. interest for the use of his capital left in the business (5 per cent. being the legal rate—*Jestons* v. *Brooke*, Cowp. 793, 796), the sum of £200 a year for six years, if Brooke so long lived, as in lieu of the profits of the trade ; Pell to have liberty to inspect the books. Brooke became a bankrupt, and this action was brought for a debt incurred by Brooke in the course of trade. " Lord MANSFIELD held that Pell was a secret partner," on this ground : " This was a device to make more than legal interest of money, and if it was not a partnership, it was a crime. And it shall not lie in the defendant Pell's mouth to say, It is usury, and not a partnership."

Pell was either a creditor of Brooke, or a joint principal with him. If he was a creditor, his contract was usurious and criminal; and MANSFIELD held that he should not be allowed, even in self-defence, to claim the position of a criminal creditor, and that, there being no other position he could occupy but that of a principal, he must be considered as a principal. In *Hoare* v. *Dawes*, 1 Doug. 371, 372 (in the year of 1780), MANSFIELD repeated the same peculiar theory, saying of " dormant partners " (meaning undisclosed partners), " they are liable when discovered, because they would otherwise receive usurious interest without any risk." Although this process of turning all creditors having usurious claims against any person into joint principals, copartners, and codebtors, liable with their debtor to his other creditors, was repudiated by the court in *Grace* v. *Smith*, when *Bloxham* v. *Pell* was cited and much relied on by the plaintiff; and although it never was law and has nearly passed into oblivion, it is still of some value as showing what erratic ideas of partnership liability could prevail in high places. When MANSFIELD could think an undisclosed partner is liable for the debts of the firm of which he is a member, not for the simple reason that he is a member (that is, a principal), but because, if he were not liable, his profits might be more than a creditor's legal interest, it would not be surprising if other judges were found entertaining, or, at least, reported as expressing, loose notions on the same general subject. *Bloxham* v. *Pell* is also of value, because it exhibits the positions of a partnership principal and a partnership creditor in striking contrast, and cogently presents the alternative of forcing a defendant into the one position or the other, without any reference to a sharing-profit test, as to which MANSFIELD's erroneous usury test affords no light.

The case *Grace* v. *Smith*, 2 Wm. Bl. 998, was, in its facts, very similar to *Bloxham* v. *Pell;* but DEGREY, instead of making the defendant a partnership principal by MANSFIELD's usury test, left the case to the jury, who found a verdict for the defendant. What instructions were

given them does not appear. The plaintiff moved for a new trial on the ground of the verdict " being contrary to law and evidence." As no exception was taken to any ruling made or instruction given at the trial, the only question was, whether there was any evidence for the defendant competent to be submitted to the jury, or whether the verdict was against the evidence. The court (DeGrey, C. J., and Gould, Blackstone, and Nares, J. J.) unanimously refused to grant a new trial. The decision is authority on no other point than this : there was no reason to disturb the verdict by which the defendant was held not liable for partnership debts. But there are certain *dicta* in the decision which have been supposed to be the origin of a sharing-profit test. Concerning the value of these *dicta*, it is to be observed that, when the court took time for consideration, Blackstone, in his reports, in accordance with the custom of English reporters, was careful to record the fact ; and that the decision in *Grace* v. *Smith* was, probably made, and the *dicta* thrown out orally, without any deliberation before or after the brief argument, and as soon as counsel sat down. A reporter's memorandum of the unpremeditated and unguarded utterances of even the highest tribunals does not always carry a high degree of authority. 1 Burrow (preface) ix. When the case came up for argument before the whole court, " DeGrey, Chief Justice, reported that this was an Action brought against *Smith* alone, as a secret Partner with one *Robinson.*" Blackstone's report of the decision is as follows :

" DeGrey, Chief Justice. The only Question is, What constitutes a secret Partner ? Every Man who has a Share of the Profits of a Trade, ought also to bear his Share of the Loss. And if any one takes Part of the Profit, he takes Part of that Fund on which the Creditor of the Trader relies for his Payment. If any one advances or lends Money to a Trader, it is only lent on his general personal Security. It is no specific Lien upon the Profits of the Trade, and yet the Lender is generally interested in those Profits ; he relies on them for Repayment. And there is no Difference whether that Money be *lent de novo*, or *left behind* in Trade, by one of the Partners who retires. And whether the Terms of that Loan be kind or harsh, makes also no manner of Difference. I think the true Criterion is, to inquire whether *Smith* agreed to share the Profits of the Trade with *Robinson*, or whether he only relied on those Profits as a Fund of Payment: a distinction not more nice than usually occurs in Questions of Trade or Usury. The jury have said this is not payable out of the Profits ; and I think there is no Foundation for granting a new Trial.

" Gould, Justice, same Opinion.

" Blackstone, Justice, same Opinion. I think the true Criterion (when Money is advanced to a Trader) is, to consider whether the Profit or Premium is certain and defined, or casual, indefinite, and depending on the Accidents of Trade. In the former Case it is a *Loan* (whether usurious or not is not Material to the present Question), in the latter a *Partnership*. The Hazard of Loss and Profit is not equal and reciprocal, if the Lender can receive only a limited Sum for the Profits of his Loan,

and yet is made liable to all the Losses, all the Debts contracted in the Trade, to any Amount.

"NARES, Justice, same Opinion.

*"Rule discharged."*

The question of fact which the jury had answered in favor of the defendant was, whether the defendant Smith was a creditor or a copartner of Robinson. Whether a partnership relation between them was disclosed or undisclosed, was, as the law is now settled, an immaterial question; and DEGREY's remarks concerning a "secret partner" were made, apparently, because, in 1775, the liability of an undisclosed partner was not so well understood as it now is, and it was thought necessary to give some other reason for holding such a partner liable than the fact that he is a partner. DEGREY begins by suggesting this other reason : "Every man who has a share of the profits of a trade, ought also to bear his share of the loss.". This is a free translation of a rule of the civil law, and must be presumed to be given with the civil law signification of the original, which has no reference to a sharing-profit test of liability to partnership creditors, but is based upon the admitted fact of partnership, and is a presumption regulating the rights and obligations of acknowledged partners, as between themselves, "in the absence of all contrary stipulations." Story on Part., secs. 19, 20, 24, 25, 26. *"Sicuti lucrum, ita damnum quoque commune esse oportet. l.* 52, sec. 1, *in f. eod. Societas cùm contrahitur, tam lucri, quàm damni communio initur. l.* 67 *eod.; l.* 52, sec. 4, *in f. eod.;"* 1 Domat (2d Eng. ed.) 142.

Pothier, treating of "what natural equity requires in the contract of partnership," as between the partners, gives this as the "First Rule:" "In order that the contract of partnership may be equitable, it is generally necessary that the share assigned by it to each of the partners, in the anticipated profits, should be in proportion to the value of what each of them has brought into the partnership;"—and this as the "Second Rule:" "Generally, each of the partners ought to bear the same proportion of the losses of the partnership, as he ought to have of its profits in case it is prosperous." Pothier on Part. (Tudor's translation) 11, 15. The subject is fully discussed in Story on Part., ch. 3. In 1788, Lord LOUGHBOROUGH (DEGREY's successor), thinking it necessary to give some other reason for the liability of "the secret partner" to the partnership creditors than the fact that he is a partner, said the reason is, "that, if a partner shares in advantages, he also shares in all disadvantages." *Coope* v. *Eyre*, 1 H. Bl. 37, 48. And when DEGREY, speaking of the liability of "a secret partner," as if it were something different from the liability of a known partner, or must stand on some peculiar ground, or needed the support of argument on account of the non-disclosure of the partnership relation, said, "Every man who has a share of the profits of a trade ought also to bear his share of the loss," we can understand his argument, though it would be considered an unnecessary one at the present day. A part-

ner, disclosed or undisclosed, entitled to a share of the profit if any is made, ought generally to bear a share of the loss, if any occurs ; and it would be presumed that such was the partnership contract if there were no express agreement on the subject.  " It is but fair that the chance of gain and of loss should be taken by the same persons; and it is natural to suppose that such was their intention if they have said nothing to the contrary."  1 Lindley on Part. 13 (1st ed.).   That is a rule of reason and natural justice, and a maxim of the civil law, which DeGrey, supposing some other reason than the fact of his being a partner was necessary for charging an undisclosed partner, might well invoke, as Loughborough did, thirteen years afterwards.   By " every man who has a share of the profits," DeGrey meant, what Loughborough said, every partner—a partner of any description—not excepting the undisclosed one whose liability he was explaining.   By " profits," in that clause, he would have meant net profits, if the distinction between gross and net profits had been in his mind, as it probably was not.

The third sentence, " And if any one takes part of the profit, he takes part of that fund on which the creditor of the trader relies for his payment," connected with the preceding sentence as it is by "And," was probably intended as a mere continuation of the previous reasoning for holding " a secret partner " liable, notwithstanding the secrecy or non-disclosure of the partnership relation.   The reporter's minute of the oral opinion appears to be abbreviated and imperfect; and no absurd meaning ought to be put upon it by strict construction or verbal criticism.   The reported third sentence, read by itself without the connecting "And," and without reference to the context or the subject of the liability of " a secret partner " of which the chief justice was speaking, can be made to mean and has been supposed to mean, that, " if any one," principal or creditor, takes a part of the profit, he is liable as a principal to all the creditors because he takes part of the fund on which they rely for payment.   In regard to this interpretation, it may be remarked, in the first place, that a partner, disclosed or undisclosed, is liable to the creditors whether he takes a part of the profit or not ; but, in the time of DeGrey, it was thought necessary to say that an undisclosed partner was liable because it was just, as between him and his copartner, in the absence of express stipulation to the contrary ; that, having a share of the benefit, he should bear a share of the burden.   In the second place, the net profit is the balance of gross profit left over and above the capital after deducting all losses and expenses, and paying all creditors ; and upon that fund it is impossible for the creditors to rely.   They cannot rely for payment on what is to be left, or what is left after they are paid.   That is the only fund they do not rely on.

If it were possible for a creditor to rely for payment upon, and to be paid out of, what is left after he is paid, what predicament would he be thrown into by receiving payment out of that fund ?   According to one interpretation of the report of DeGrey's opinion, by taking part

of that fund,—by receiving payment out of the fund he had a right to rely on and to be paid out of,—a creditor would instantaneously become liable to all the other creditors; and the moment each of the others received payment out of the same fund, he would become liable in like manner. Receiving payment of debts out of a proper fund, would be more hazardous than giving credit. Collecting debts might be more ruinous than losing them. The only safe course for creditors would be not to collect their debts out of the fund, whatever it was, on which they properly relied for payment. Fortunately the transformation of a creditor, by the payment of his debt out of the net profit, into a partnership principal and debtor liable to all the other creditors, is impossible.

If, by the true interpretation of DeGrey's opinion, *Grace* v. *Smith* were an authority for such an impossible transformation, it would be sufficiently disposed of without going any further. The first three sentences of the fragmentary report of the *dicta* of DeGrey are the foundation on which all the authorities supposed to favor a sharing-profit test are based. That case is, and is regarded by all the authorities as, the one in which the supposed test originated; and it should have been treated as the leading case instead of *Waugh* v. *Carver*. The whole argument, so often reiterated from 1775 to the present time, in favor of such a test, has been a mere repetition of the supposed meaning of the reported remark of DeGrey,—"And if any one takes part of the profit, he takes part of that fund on which the creditor of the trader relies for his payment." Who is "any one," and what is "the profit"? A creditor is "any one;" and the balance left, over and above the capital, losses, expenses, and debts of every kind, is "the profit" in a certain sense. If it is urged that DeGrey meant that creditor A should be liable to other creditors because he is paid or is to be paid out of what may be left after he is paid; that this doctrine was approved by the English authorities from 1775 to 1860, and by the American decisions to the present time; and that it is a settled rule of law which nobody but the legislature can change,—it is answer enough to say, that neither DeGrey, nor any one else, could have meant any such thing; that, if DeGrey and everybody else have inadvertently used a formula which, upon investigation, is found to be capable of no other meaning than that, it is certain they did not use it in that sense, and, therefore, we have their authority for not using it in that sense; that, if they did not use it in any other sense, we cannot, upon their authority, either use it in any other sense, or use it at all; and that, if they did use it in some other sense, we are not called upon to accept or reject that other sense before it is discovered. To use the formula in a sense in which we know the authorities could not have intended to use it, would be an irreverent and revolutionary perversion and overthrow of precedent. If it could be shown that DeGrey, and all the venerated authorities of the last hundred years, meant that creditors rely for payment on what is left after they are paid, it would require no great courage, in this age, to say that we do not propose to assert our belief in a dogma that is either preposterous or unintelligible.

"And if any one takes part of the profit, he takes part of that fund on which the creditor of the trader relies for his payment." In whatever sense DeGrey used the word "profit," he did not mean that a creditor, relying upon and paid out of the "profit" or any other fund, is, by such reliance and payment, transformed into a copartner with his debtor, and made liable to all the other creditors. Twice in his brief opinion he distinctly recognizes the right of a creditor to rely on "profits" for payment (including, of course, the right to be paid out of the "profits" relied on), without thereby becoming liable as a partner. By "any one" he did not mean a creditor. Whom else could he mean but a partner? If by "profit" he meant gross "profit," that is not the fund generally referred to when partners agree "to share the profits." If by "profit" he meant net "profit,"—a balance of gross "profit" left after all creditors are paid,—who but a sole principal or a partner can take a part of that fund? If, by "profit," he meant a balance of gross profit left after the payment of all creditors except those deferred ones who are to be paid out of that balance; and if he meant that such deferred creditors are liable to those not thus postponed, the contrary doctrine is too firmly established by an overwhelming preponderance of the subsequent authorities, English and American, to be now questioned. 3 Kent Com. 25–33; Collyer on Part., secs. 39–44; Story on Part., secs. 32–49; Parsons on Part. 81–85, n.; Berthold v. Goldsmith, 24 How. 536, 543; in re Francis, Pacific Law Rep., Dec. 17, 1872 (U. S. Dist. Ct. of Oregon).

What DeGrey meant is to be ascertained, not by a literal and ridiculous interpretation of some dark passage in the fragmentary report, but from some rational sense of his whole opinion. Taking the third sentence in connection with the reason he was giving for holding "a secret partner" liable (with which it is visibly coupled by "And"), and with the rest of the opinion, and making due allowance for the inaccuracy of a hasty memorandum made by one man of an extemporaneous effusion of another, the general drift of the whole is plain enough, and is plainly opposed to a sharing-profit test in any other sense than sharing profit in the capacity of a principal. The terms "profit" and "profits" he apparently used without any discrimination between gross and net profit. The general and uncertain idea of profit, indefinite as it is in the report, is no more indistinct than ideas are apt to be under similar circumstances, but more so than it would have been had its influence been foreseen. To give clearness and precision of thought and expression to what he is reported to have said about profit would now be an unauthorized alteration, likely to impose a meaning and produce results not contemplated by the author.

Some notion of a creditor relying on profit seems to be presented three times in his opinion,—the last time in a formal summing up and explicit statement that leaves no doubt what his test of the defendant's liability was, however cloudy the reported theory of creditors relying on profits. "I think the true criterion is to inquire whether Smith agreed to share the profits of the trade with Robinson, or whether he

only relied on those profits as a fund of payment." Here is presented (with an undefined and undistinguishing idea of "the profits") the right of a partner "to share the profits," in contrast with the right of a creditor to rely "on those profits as a fund of payment." If Smith "only relied on those profits as a fund of payment,"—"payment" implied the relation, not of joint principals, but of debtor and creditor between Smith and Robinson, and a debt to be paid to Smith by Robinson out of Robinson's property. But if Smith "agreed to share the profits of the trade with Robinson," that is, to own them in common with Robinson before they were divided, and to divide them as their joint property into shares, and not to receive a share of Robinson's "profits" in "payment" of a debt,—"to share the profits," in that sense, implied the relation, not of debtor and creditor, but of joint principals. Parsons on Part. 73, n. This contrast was DeGrey's "true criterion" of the defendant's liability. He merely stated the question, Creditor, or partner? in the form in which it seemed to him to arise in that case. That question was his test. He made no distinction between "partners *inter sese*," and "partners as to third persons." The defendant had not aided Robinson in getting credit from the plaintiff, by holding himself out or suffering himself to be held out as a partner; and therefore, as he was not estopped to deny that he was a partner, the question of "partner as to third persons" did not arise. "This was an action brought against Smith alone, as a secret partner with one Robinson." The plaintiff's claim was, that the defendant and Robinson were partners *inter sese*, though their partnership relation was not disclosed. The defendant was liable to the plaintiff if he was in fact a copartner of Robinson as between Robinson and himself: if he was not such a copartner he was not liable. If he was to receive something from Robinson in "payment" of a debt, he was a creditor: if he was "to share the profits of the trade with Robinson," not in "payment" of a debt, he was a partner. Whether he was a creditor or partner depended upon their agreement, that is, their understanding. If they understood he was a creditor, he was a creditor: if they understood he was partner, he was a partner. What they understood was a question of fact which the jury had decided in favor of the defendant; and there was "no foundation for granting a new trial" on the ground of the verdict being contrary to the evidence. This is the gist of De Grey's opinion; and it is decisive against a sharing-profit test in any other sense than sharing profit in the capacity of a joint principal and copartner, as distinguished from the character and position of a creditor.

"If," says DeGrey, "any one advances or lends money to a trader, it is only lent on his general personal security. It is no specific lien upon the profits of the trade." If the defendant, as a partner, left his money in the business, he had the "specific lien" of a partner "upon the profits;" that is, the profits, being owned in common by him and Robinson, could not be diverted to the payment of Robinson's private debts, to the damage of the defendant. If, as a creditor, he lent his

money to Robinson, he lent it on Robinson's "general personal secu-
rity," and he had "no specific lien upon the profits," although he was
"interested in those profits" (gross profits), because he relied "on
them for repayment," as he relied on the rest of Robinson's property.
The "specific lien" here spoken of, is the lien or title of a partner.
Upon all the partnership property, a partnership creditor has such a
lien as gives him a preference over the private creditors of the partners,
which the law will enforce.   The "specific lien" or right of a partner
in any partnership property, capital, or profits, the partner can enforce
himself by holding possession without process of law.   The "specific
lien," or right of a partner in the partnership property, is put by DE
GREY in contrast with the "general personal security" on which "any
one," in the capacity of a creditor, "advances or lends money to a
trader."   He alludes to "specific lien," not as a test,—not as a fact the
easy proof or disproof of which answers the question, Creditor, or part-
ner?—but as a consequence and partial description of the partnership
relation.   He merely says that one who becomes a creditor by loaning
money has "no specific lien upon the profits" of his debtor.   This
statement has been taken as a declaration that a "specific lien upon
the profits" is a test of partnership liability.   Such a test is as uncon-
trovertible as any other right, power, obligation, or attribute of a part-
ner.   It amounts to this: he who has the "specific lien" of a partner
is a partner.   It is one of the numerous ways of saying a partner is a
partner.   DEGREY's remark about "specific lien" was a mere refer-
ence to one of the contrasts between a creditor and a partner,—a mere
illustration of the difference between them,—which difference was his
test of the defendant's liability to the plaintiff.

BLACKSTONE, J., made no distinction between "partners *inter sese*"
and "partners as to third persons," but held that, as between the
defendant and Robinson, their chances of loss and profit ought to be
equal and reciprocal.   In the absence of an express stipulation on that
point, it would naturally be presumed that they understood their chances
of loss and profit were to be equal and reciprocal.   "Every man who has
a share of the profits of a trade, ought also to bear his share of the loss,"
said DEGREY, repeating the civil law.   "*Illud expeditum est, si in unâ
causâ pars fuerit expressa (veluti in solo lucro, vel in solo damno) in altera
verò omissa: in eo quoque quod praetermissum est, eandem partem servari.*
Sec. 3, *inst. de societ.*"   1 Domat (2d Eng. ed.) 142.   Many inferences
of fact are laid down in the authorities of the civil law, because, under
that system, questions of law and fact being decided by the court with-
out a jury, there is little occasion to preserve the distinction between
law and fact, which is indispensable under the common-law system of
a court to decide the law and a jury to decide the facts.   BLACKSTONE,
recognizing the question, Creditor, or partner? as the ultimate inquiry;
seeking for nothing but the understanding of the defendant and Robin-
son on that question; not constructing "a partnership as to third per-
sons" out of a creditorship *inter sese*,—inferred, from the defendant's
"profit or premium" being a limited and certain sum, that they

understood he was not to be a partner liable for an unlimited amount of debts. That was a fair inference of fact, and a proper one for the court to draw in a case like *Grace* v. *Smith*, where the question was whether the verdict was against the evidence.

In *Hoare* v. *Dawes & a.*, 1 Doug. 371 (1780), the ground of action was, that the defendants, who, with others, had employed a broker to buy tea, were liable as partners. The verdict was for the defendants. Lord MANSFIELD, before whom the case was tried, reported the evidence for the consideration of the whole court, on a motion for a new trial. And the court, weighing all the evidence, and coming to the conclusion that, as a matter of fact, the defendants were not partners with the others, were satisfied with the verdict.

In *Coope & a.* v. *Eyre & a.*, 1 H. Bl. 37 (1788), is an authority against a literal and unqualified sharing-profit test; and also goes far to show that *Grace* v. *Smith* is opposed to such a test. It appeared at the trial that " the defendants, *Eyre* for himself and partners (who were *Atkinson* and *Walton*, general merchants), *Hattersley*· for himself and *Stephens*, who were oil merchants, and *Pugh* for himself and son, who were also oil merchants, agreed to purchase jointly as much oil as they could procure, on a prospect that the price of that commodity would rise. That *Eyre* should be the ostensible buyer, and the others share in his purchase at the same price which he might give. *Hattersley* & Co. were to have one fourth, *Pugh* one fourth, and *Eyre* & Co. the remaining moiety ; that they bought large quantities of oil belonging to other ships and other traders besides the plaintiffs, in the name of *Eyre* & Co. ; that *Hattersley* and *Pugh* occasionally came forward and gave directions as to the delivery of the oils, and otherwise interfered in the transaction, and also made many declarations ' that they were all jointly interested in the different purchases, and that there was a general concern between them.' * * Lord LOUGHBOROUGH, after declaring his opinion (that, as the defendants did not appear to have been jointly concerned further than the purchase of the oil, they had not such a joint interest in the *profit and loss* as the law made necessary to a partnership), directed a verdict to be found for them, which was accordingly done." GOULD, J., in his opinion, speaks of " the jury having found for the defendants." Whether the verdict was ordered, or the jury adopted LOUGHBOROUGH'S opinion distinctly announced to them, is not important. English judges sometimes, without absolutely ordering a verdict, express their opinion of· the evidence alone, or the evidence and law together, in a positive manner that is practically equivalent to ordering a verdict ; and sometimes, in such and in other cases, on motions for new trials, the distinction between conclusions of law and conclusions of fact is not clearly recognized.

In the argument of a motion for a new trial, in *Coope & a.* v. *Eyre & a.*, it was asserted by the defendants that, " in *Hoare* v. *Dawes* and *Grace* v. *Smith*, it is established as essential to a partnership, either that there should be a contract to share profit and loss, or that the parties should offer their joint credit to the vendor." The plaintiffs

"admitted that a participation of profit and loss was necessary to constitute a partnership, and argued that this was a contract of that nature." GOULD, J. (one of the judges who decided *Grace* v. *Smith*), said,—" I think the true criterion is as stated by Mr. J. BLACKSTONE, in the case of *Grace* and *Smith,* ' whether they are concerned in profit and loss;' and the same doctrine is in effect held by Chief Justice DEGREY in that case." Finding the fact to be, upon the evidence, that the defendants were not jointly concerned in profit and loss, he said,— " In this light I am of opinion there is no foundation for the court to adjudge the present case a partnership; and the jury having found for the defendants, that there is no reason to disturb the verdict." HEATH, J., said,—" *Eyre* and Co. are the only purchasers known to the plaintiffs; entire credit was given to them alone. *Pugh, Hattersley,* and *Stephens* can be liable only in the event of a concealed partnership, on this principle, ' that the act of one partner binds all his copartners, on account of the communion of profit and loss.' " He found upon the evidence there was no such communion,—quoted a passage from the civil law in support of *Hoare* v. *Dawes*,—and concluded against a new trial. WILSON, J., was of opinion a new trial ought to be granted, on the ground that the verdict was against the evidence, which tended to show that the defendants, by their conduct and statements, had admitted themselves to be joint principals. He said,—" The contract was actually made between the plaintiff and *Eyre* and Co., but if the other defendants were jointly concerned in it, they ought to be responsible, as much as · if they had personally contracted. That they were so concerned, sufficiently appears from the contracts with the other merchants and their own declarations; these I think were proper to be given in evidence, being against themselves, to which evidence the verdict was contrary. The defendants were all concerned in a general speculation. There was an original agreement between them to purchase as much oil as they could procure. Of what nature that agreement was there is no evidence precisely to prove, no witness having been present when it was concluded. It might have been such as would have made them jointly answerable, or it might not. How then are we to collect what it was? Surely, from the declarations of the parties themselves." He then reviewed the evidence showing admissions of defendants who contested the suit that they were joint principals; referred to " such a participation of profit and loss as will make a partnership;" and remarked, " in *Grace* v. *Smith* the terms of the contract [between Smith and Robinson] were stated; if the terms of this contract had been stated, we might have judged of the responsibility of the defendants, but not being stated, we must receive their own acknowledgments of responsibility."

LOUGHBOROUGH, C. J., said he still continued to think the defendants were not liable as partners; "the vendor can have no remedy against any person with whom he has not contracted, unless there be a partnership. * * In order to constitute a partnership, a communion of profits and loss is essential. The shares must be joint, though it is not

necessary they should be equal.   *   *   Eyre was a mere speculator, and the other defendants were to share in the purchase, but were not jointly interested in any subsequent disposition of the property.   *   * In the transaction in question [with the plaintiffs] there was not that communion between them necessary to make them partners."

" Communion of profit and loss" is civil law language, and means a certain condition of partnership, that is presumed, in the absence of a stipulation to the contrary (1 Domat 1, 8, 1, art. 8, 9 ; Story on Part., sec. 62), as between the partners, without regard to third persons. *Sicuti lucrum, ita damnum quoque commune esse oportet. Societas cùm contrahitur, tam lucri, quàm damni communio initur.* LOUGHBOROUGH had not forgotten the civil law which he had studied and practised in Scotland. *Coope & a.* v. *Eyre & a.* shows that, in 1788, the court of common pleas (their attention being particularly called to *Grace* v. *Smith,* decided in that court thirteen years before, and one of the judges who decided it still remaining on the bench) did not understand that a literal and unqualified sharing-profit test had been established in that or in any other case.

"A partnership is a joint understanding to share in the profit and loss." If there is no estoppel, the question is whether the defendants " considered themselves as partners." *Saville* v. *Robertson,* 4 D & E. 720, 727, 728. When ASHHURST, J., in that case, speaking of the liability of " do. mant partners," says,—" There the party furnishing the goods may resort to all those who are entitled to share in the profits ; for though in such case the dormant partners may not be known at the time of the contract, yet," when discovered, they are liable,—he does not lay down a sharing-profit test in conflict with his definition of a partnership, " a joint undertaking to share in the profit and loss." " To share in the profits " was an elliptical repetition of his previous expression " to share in the profit and loss." Sharing profit and loss is a different thing from sharing profit, when the sum of the losses exceeds the sum of the profits.

" Though, in point of fact, parties are not partners in trade ; yet, if one so represents himself, and by that means gets credit for goods for the other," both are liable. *De Berkom* v. *Smith,* 1 Esp. 29 (1793).*

---

*" The following portions of the examination of Mr. Commissioner Fane, before the select committee on the law of partnership, printed by order of the House of Commons, 8 July, 1851, place the fallacy of the reasoning in *Grace* v. *Smith* and *Waugh* v. *Carver* in very strong light:   *   *   ' I see no evil in any part of the law of partnership, except that by which it is established that he who contributes to the funds of an undertaking, on the terms of sharing in the profits, is liable, as a partner, to all the engagements of the partnership to "his last acre and last shilling," although he does not disclose his name ; but in that I consider that there is the greatest evil, because its tendency is to prevent capital coming forward to aid industry, ingenuity, and enterprise.  Capital without industry is dead, and so is industry without capital.  It is the union of the two out of which all wealth arises.  It seems, therefore, most impolitic to discourage that union by saying to each accumulator, You shall not risk any portion of your accumulations for the aid of struggling industry or struggling ingenuity, on the terms of sharing in profits, if profits there be, without risking every farthing you have

In *Waugh* v. *Carver*, *Carver*, and *Giesler*, 2 H. Bl. 235 (1793), under written articles of agreement between the defendants, Giesler " removed from Plymouth and settled at Cowes, where he carried on the business

---

in the world. Nor, indeed, is it easy to see what right the law has thus to interfere with each man's discretion. Take a very common case. A person,—a successful lawyer, for instance,—who has some accumulations lying idle, hears of a project which has' been started by some enterprising person, the rescue of a large tract of land, in Victoria county, from the sea. He approves the idea, has confidence in its promoters, and is content to risk a moderate sum,—1,000*l*.,—on the success of the enterprise, but no more. " No," says the law, " you shall not risk moderately ; if you risk at all, you shall risk your last acre and last shilling." What right has t'e law thus to dictate, thus to control his discretion ?

It is admitted on all hands that he might have advanc_ the same sum at 5*l*., 10*l*., 20*l*., per cent. interest, and incurred no risk beyond his advance ; 'hy should he not be permitted to advance it for a share of profits, and incur no further risk ? What difference is there between interest and profit, but that interest is certain and profit uncertain ? What is interest but a fixed share of profit ? Why should asking for interest involve no liability whatever, and asking for profit involve liability absolutely boundless ?

In the early part of my professional life, circumstances induced me to study the law of partnership, and I found this strange provision in it. I was so startled and amazed that I set about tracing it to its source, and then I discovered that it had, properly speaking, no foundation at all. I traced it to a case decided in 1793, on the alleged authority of a case decided in 1775, which last not only did not affirm it, but actually negatived the liability of the alleged partner.

The case in 1775 was *Grace* v. *Smith*, 2 W. Blackstone's Rep. 998. There Grace endeavored to make Smith, who had retired from a partnership some years before, responsible for a subsequent debt of the partnership, on the ground that he, on retiring, had stipulated for a share of the profits. The counsel who argued for the plaintiff, to support his argument, took from his pocket what, in the language of our profession, is called pocket-pistol law, that is, a manuscript account of an unreported case, which he said had been decided a few months or weeks before by Lord MANSFIELD,—*Bloxham* v. *Pell*,—in which Lord MANSFIELD had decided in a similar case that the retired partner was liable. This argument and case, however, produced no effect, for Chief Justice DEGREY and the three other judges held that the defendant was *not* liable. Similar attempts to make persons responsible for debts, as dormant partners, were repeated in 1780, in *Hoare* v. *Dawes*, 1 Doug. Rep. 371 ; and again in 1788, in *Coope* v. *Eyre*, 1 H. Blacks. 37, but they failed; nor was it till 1793 that the doctrine was established. In that year, the case of *Waugh* v. *Carver*, 2 H. Blacks. 235, was heard. Two houses, who acted as agents for ship-owners, had agreed to assist each other in procuring agencies : and it was agreed that they should divide the profit of a portion of their agency business. The two houses were entirely distinct, and had no other connection with each other than the above, which was secret. One carried on business at Cowes, the other at Gosport. The ` Cowes house failed, whereupon a creditor of that house sued the Gosport house for goods sold and delivered to the Cowes house ; and, having obtained a verdict subject to the opinion of the court, the case was argued before the full court, and judgment given for the plaintiff. In giving judgment, Lord Chief Justice EYRE admitted that the two houses " were not, nor ever meant to be, partners ; " that they had no "idea that either was to be involved in the consequences of the failure of the other ; " and that they did not understand " themselves responsible for any circumstances that might happen to the loss of either." But, said he, " that was the agreement *between themselves*. But the question is, whether they have not, by parts of their agreement, constituted themselves ·partners in respect to *other persons*. The case, therefore, is reduced to the single point whether the Carvers did not intitle themselves, and did not mean to take a moiety of the profits of Giesler's house, generally and indefinitely, as they should arise, at certain times agreed upon for the settlement of their accounts. That they have so done is clear upon the face of the agreement ; and, upon the authority of *Grace* v. *Smith*, he who *takes a moiety of all the profits* indefinitely, shall, by operation of law, be made liable to losses, if losses arise, upon the principle, that, by taking a part of the profits, he takes from the creditors a part of that fund which is the proper security to them for the payment of their debts. That was the foundation of

of a ship agent, in his own name, and contracted for the goods, &c.,
which were the subject of this action." "A verdict was found for the
plaintiff, subject to the opinion of the court, on a case which stated"

---

the decision in *Grace* v. *Smith*; and I think it stands on the fair ground of reason."
The result was, that the Gosport house was made liable.

It must surely be admitted that the decision in that case was most unreasonable, be-
cause the creditor, when parting with his goods, had never looked to the Gosport house
for payment, nor had the Gosport house ever voluntarily undertaken the liability; so
that two contracts were *invented* by the law,—a contract by the creditor to sell and deliver
to the Gosport house, and a contract by the Gosport house to pay,—neither of which had
been dreamed of by the parties concerned. This is not the function of law. The func-
tion of law is not to invent contracts, but to find out what contracts men have really
made, and enforce their due performance.

The result of this case has been a series of contradictory decisions, the judges some-
times affirming the false political economy of *Waugh* v. *Carver*, and sometimes setting
it aside, as leading to results perfectly absurd. A late writer,—Gow on Partnership
(edition 1830),—after commenting on the decisions, says, p. 20,—"Nominally, there
is a discrepancy between the cases, but in what the substantial difference consists,
it is not easy to determine;" and he adds,—"It would be presumptuous to canvass or
question the propriety of distinctions which have obtained the sanction of so many en-
lightened judges." The matter, however, is too important in a public point of view to
excuse slavish submission to authority without inquiry, and I hope, therefore, I shall
stand excused, if I venture to discuss the reasoning in *Waugh* v. *Carver*. What was it?
It was, that "he who takes a share of the profits of a business, takes part of the fund
on which creditors rely for payment." 'Can anything be conceived more false? Cred-
itors neither can nor do rely on profits for payment. Profits do not exist till cred-
itors are paid. Look at any individual transaction: A sells goods to B for 100*l*.; B
resells them for 110*l*. There is 10*l*. profit. Does the creditor look to this 10*l*. for the
payment of his 100*l*.? No; he looks to the 100*l*. That sum would pay him, and is the
proper fund to pay him. The 10*l*. would not. The 10*l*. evidently belongs to B, and is
the fund to enable him to pay the outgoings of his trade, and subsist himself and his
family. If, therefore, any creditor did look to the *profits* of a trade, as his fund for
payment, he would be a most unreasonable person, for he would wish that his customer,
and his customer's wife, family, and servants, should all starve, profits being the only
fund they have to live on.

But, if the principle, that he who takes part of the profits of a business ought to be
responsible to the creditors of the business is a right principle, it ought to be carried
out fully, and then it would involve other and very serious consequences; for, upon
that principle, every annuitant on a business, and every creditor who charged exorbi-
tant interest for the use of money lent, ought to be responsible to creditors; for they
certainly do take part of the fund to which creditors look. They are entitled to be
paid even though no profits are made. And so, again, if the head of a house determine
to pay his managing clerk a salary equal to one tenth of the profits, the managing
clerk ought to be responsible to creditors, for he also would take a share of the fund on
which creditors are supposed to rely for payment; but here the law is staggered by its
own conclusions, and hence it has been held by a distinction, which Lord ELDON has
spoken of as "extremely thin" *(ex parte* Hamper, 17 Vesey 404), that a servant so
paid is not a partner.

The truth is, that the decision in *Waugh* v. *Carver* was not law, but mistaken politi-
cal economy. The only safe principle to go on is this, that those and those only are
responsible to creditors, who either *are partners*, or have *publicly* declared themselves
as such, and have thus authorized all who deal with the partnership to consider and
rely on them as partners. It may, however, be supposed that the law in question is
part of the old law of England, or that it existed in the law of Rome. I do not believe
that a trace of it is to be found in either. All the treatises on partnership that I have
seen trace the law to *Grace* v. *Smith*, and trace it no further.

Then is it reasonable to fasten this extravagant liability,—"to the last acre and the
last shilling,"—on those who are willing to aid industry and enterprise by advances of
capital? Is it a crime to aid enterprise? What would this country have been without
the assistance of the joint stock principle? Should we have had either canals, or

the articles of agreement.  " And the question was, whether the defend-
ants were partners, on the true construction of the articles."  The Car-
vers were to continue their business of ship agents at Portsmouth; and
certain profits of the business at both ports were to be divided between
the defendants in certain proportions.  There was a stipulation that
neither of them should be affected by any loss that might happen to the
other, or be answerable for the acts of the other.  The court consisted
of Eyre, C. J., and Gould, Heath, and Rooke, J. J.  The chief justice
delivered an opinion, in which Gould and Heath concurred : Rooke,
having been counsel, did not sit.  Gould was one of the judges who
decided *Grace v. Smith;* and Gould and Heath had delivered opinions
in *Coope* v. *Eyre.*

The chief justice begins by saying, that, if there were an annuity
granted out of a banking house, to the widow, for instance, of a de-
ceased partner, it would not make her liable to the debts of the house.
This can mean no more than that an annuitant is not necessarily a
partner.  A partner might stipulate for an annuity instead of any other
form of benefit.  But an annuity is not a common kind of partnership
interest; and the widow of a partner does not usually take his place in
a banking house.  In the supposed case, the annuity, the nature of the
business of the house, and the sex of the annuitant, would be circum-
stances tending to show that she was a creditor and not a partner.

The second part of Eyre's opinion relates to estoppel.  " The defini-
tion of a partnership cited from Puffendorf is good as between the

---

docks, or gas, or water supply, or clubs, or a thousand other necessaries and luxuries of
life we now revel in ?   It is to this principle that we owe our Bank of England and
even our Indian empire; and why, I would ask, should the law be so harsh against
contributors, and so tender to creditors?  Contrast the cases of two persons, A and
B, each possessed of 1,000*l.*, and desirous of employing it, but unable to employ it
themselves, one of whom, A, determines to lend his 1,000*l.* on the terms of having the
principal back with interest at say 20*l.* per cent. per annum, and the other, B, deter-
mines on advancing his on the terms of risking his capital and receiving a share of
profits from the trade of the person who accepts the use of it, if profits are made.
Suppose they both hand over their 1,000*l.* to the same person, C, and C carries on the
business for five years, and becomes bankrupt.  In the five years, A gets back 1,000*l.*
by interest at 20*l.* per cent. per annum.  The extortion of A has year by year swal-
lowed up the profits of C's trade, and in consequence B has never received a farthing
for profits.  See how the law treats these two persons on the bankruptcy of C.  It
allows A, the extortioner, who has got back his 1,000*l.*, to prove for the 1,000*l.* he
lent, and it not only will not allow B, who has got nothing, even to prove, but it de-
clares that " his last acre and last shilling " are to be taken from him to restore to A,
the extortioner, his original 1,000*l.*;—and why ?  Because he asked for profits, if made,
and not interest.  Is this even-handed justice ?  What is there so wonderfully merito-
rious in A's asking for interest, that the law should take such extraordinary care of
him ?  What is there so desperately wicked in B's conduct in asking for profits, if
made, that the law should set about reducing him to beggary ?  Each had 1,000*l.* to
spare, and each was willing to risk it on their confidence in C's intelligence and honesty,
one as a creditor, the other as a contributor.  Each was mistaken in his opinion of C.
Why is one to be enriched and the other ruined ?  What interest has the public in the
question whether A loses and B gains, or B loses and A gains ?  Why should the pub-
lic, that is, the law, for the benefit of A, invent a contract for B which he never wished
to enter into, and which A did not rely on when he parted with his money ?  1 Lind-
ley on Partnership (1st ed.) 40, note *l.*

parties themselves, but not with respect to the world at large. If the question were between A and B whether they were partners or not, it would be very well to inquire whether they had contributed, and in what proportions, stock or labour, and on what agreement they were to divide the profits of that contribution. But in all these cases a very different question arises, in which that definition is of little service. The question is generally not between the parties as to what shares they shall divide, but respecting creditors, claiming a satisfaction out of the funds of a particular house, who shall be deemed liable in regard to these funds? Now a case may be stated, in which it is the clear sense of the parties to the contract that they shall not be partners; that A is to contribute neither labour nor money, and, to go still farther, not to receive any profits. But if he will lend his name as a partner, he becomes as against all the rest of the world a partner, not upon the ground of the real transaction between them, but upon principles of general policy, to prevent the frauds to which creditors would be liable if they were to suppose that they lent their money upon the apparent credit of three or four persons, when in fact they lent it only to two of them, to whom, without the others, they would have lent nothing."

The third part of the report of EYRE's opinion has caused this case to be considered a leading one. In its general tone, this third part is a continuation of his previous statement of estoppel. If his remarks were accurately reported, he said,—" It is plain, upon the construction of the agreement, if it be construed only between the Carvers and Gies-ler, that they were not nor ever meant to be partners. They meant each house to carry on trade without risk of each other, and to be at their own loss.   *.   *   That was the agreement between themselves. But the question is, whether they have not by parts of their agreement constituted themselves partners in respect to other persons. The case, therefore, is reduced to the single point, whether the Carvers did not intitle themselves, and did not mean to take a moiety of the profits of Giesler's house generally and indefinitely, as they should arise, at certain times agreed upon for the settlement of their accounts. That they have done so, is clear upon the face of the agreement : and, upon the authority of *Grace v. Smith*, he who takes a moiety of all the profits indefinitely, shall, by operation of law, be made liable to losses, if losses arise, upon the principle that, by taking a part of the profits, he takes from the creditors a part of that fund which is the proper security to them for the payment of their debts. That was the foundation of the decision in *Grace v. Smith*, and I think it stands upon the fair ground of reason.   *   *   If, therefore, the principle be true, that he who takes the general profits of a partnership must of necessity be made liable to the losses, in order that he may stand in a just situation with regard to the creditors of the house, then this is a case clear of all difficulty. For though, with respect to each other, these persons were not to be considered as partners, yet they have made themselves such with regard to their transactions with the rest of the world. I am therefore of opinion that there ought to be judgment for the plaintiff."

In Massachusetts, in 1821, this third part of EYRE's opinion seems to have been regarded as the same as the second part,—as the doctrine of estoppel, and nothing more. "It is there [in *Waugh* v. *Carver*] stated by EYRE, C. J., that ' he who takes a moiety of all the profits indefinitely, shall, by operation of law, be made liable for losses, if losses arise, upon the principle that, by taking a part of the profits, he takes from the creditors a part of that fund which is the proper security for the payment of their debts.' This remark, as a general observation, is true. It may be that, as between the parties, no partnership exists; and yet that they may have conducted themselves in such manner as to have induced others to believe that such a partnership existed, and to give credit accordingly. In such a case, they are not to be protected by their private agreement that one shall not be held answerable for the other "—*Rice* v. *Austin*, 17 Mass. 197, 205. If this was all EYRE meant, there is no difficulty in the authorities. But, if *Waugh* v. *Carver* is fully and accurately reported, it would seem that he meant something more or less than estoppel.

The apparent meaning of the report is, that, as " between the Carvers and Giesler," " they were not nor ever meant to be partners;" that, " upon the authority of *Grace* v. *Smith*, he who takes a moiety of all the profits indefinitely, shall, by operation of law, be made liable to losses, if losses arise, upon the principle that, by taking a part of the profits, he takes from the creditors a part of that fund which is the proper security to them for the payment of their debts: that was the foundation of the decision in *Grace* v. *Smith*, and I think it stands upon the fair ground of reason;" and that, " though with respect to each other, these persons were not to be considered as partners, yet they have made themselves such with regard to their transactions with the rest of the world." According to the report, EYRE professed to follow " the authority of *Grace* v. *Smith*," and " the principle" which " was the foundation of the decision in *Grace* v. *Smith*." He intended to invent no new law. He meant to be governed absolutely by a particular precedent, and " the principle" of that precedent. He distinctly stated that precedent, and " the principle" of it. He is not to be charged with the introduction of new law, when he avowed his passive obedience and implicit submission to authority. The doctrine which he reverently accepted was " the principle that, by taking a part of the profits, he takes from the creditors a part of that fund which is the proper security to them for the payment of their debts." He said that was the doctrine of *Grace* v. *Smith*, and he thought it stood " upon the fair ground of reason." It will be quite time enough for us to accept or reject this doctrine, when we are informed what it is,—what DEGREY meant by it, and what EYRE supposed DEGREY meant. When there is but one creditor, the question does not arise: the question arises when a defendant, as well as a plaintiff, claims to be a creditor. If there are several creditors, every one of them (except the one last paid) who takes a part of the fund, capital or gross profits, on which he relies for payment, takes a part of the fund on which other creditors (one or

more) rely. As to net profit, creditors do not rely for payment on what will be or what is left after they are paid. It is apparent, therefore, that DeGrey did not mean, and that Eyre did not suppose De Grey meant, that a creditor, taking capital or profits in payment of a debt, and thereby taking a part of the fund on which other creditors rely, becomes liable, by that act and for that reason, to those other creditors.

"The foundation of the decision in *Grace* v. *Smith*" was, that the question, Creditor, or partner ? was the test of the defendant's liability to the plaintiff, and that that question did not appear to have been erroneously decided by the jury in favor of the defendant. The dark reported saying of DeGrey about taking a part of the fund on which creditors rely, whatever archæological interest it may possess, would be uninteresting if it were now put forth for the first time. As a literary curiosity, it may receive some attention : as a legal proposition, its meaning and value have never been satisfactorily made out. It is no matter of wonder if, occasionally, a loose, unconsidered, extemporaneous remark of a fallible judge, as understood, abridged, and hurriedly thrown upon paper by an unofficial, volunteer reporter, who perhaps did not " write short-hand nor very quickly " (1 Doug. x, *preface*), is, upon critical examination, found unintelligible.

Decided in the same court, and reported in the same volume with *Waugh* v. *Carver*, is the case *Benjamin* v. *Porteus*, 2 H. Bl. 590. The question is whether one Bennett, a broker, who was to have a share of profit, is a competent witness, or whether he is rendered incompetent by being a partner. It is argued on one side, that " he was to have a profit on the sale, not as a broker, but as a partner ; " and on the other side, that he " was nothing like a partner, as there was no communion of profit and loss." The court, deciding the question by the weight of the evidence, is divided in opinion. Eyre, C. J., thinks " here the agent takes a profit in fact as a principal : " Heath and Rooke, J. J., think he takes it " as a broker, and not as a principal." This case is important, not as an authority on the test of partnership liability, but as showing that Eyre (as well as DeGrey) recognized the distinction between taking profits " as a principal," and taking them as a creditor. And when, in *Waugh* v. *Carver*, he repeated DeGrey's remark about taking profits,—and when it is apparent he did not mean taking profits as a creditor,—what could he mean but taking them as a principal ? If that is his meaning, there is no difficulty in the authorities. The objection to this explanation is, he is reported to have said that, as between the defendants, " they were not nor ever meant to be partners : " but this was said with reference to, and as synonymous with, the next sentence,—" They meant each house to carry on trade without risk of each other, and to be at their own loss." He might have meant that, *inter sese*, they were not partners in the sense of being, *inter sese*, chargeable with the losses of both houses, although they were principals who jointly carried on the business of both houses. He might have meant that persons are not fully and strictly partners (according to the

common understanding and practice of partnership), unless, *inter sese*, their losses are joint; that when, *inter sese*, their losses are not joint, they are partners only in a qualified and peculiar sense: and this would be so if " a communion of profit and loss." is a correct definition of partnership.

This explanation has the support of high authority. In *Cox* v. *Hickman*, 9 C. B. (N. S.) 47, 92, 95 (1860), Lord CRANWORTH said,—"A right to participate in profits affords cogent, often conclusive, evidence that the trade in which the profits have been made was carried on in part for and on behalf of the person setting up such a claim. But the real ground of the liability is, that the trade has been carried on by persons acting on his behalf. When that is the case, he is liable to the trade obligations, and entitled to its profits, or to a share of them. It is not strictly correct to say, that his right to share in the profits makes him liable to the debts of the trade. The correct mode of stating the proposition is, to say that the same thing that entitles him to the one makes him liable to the other, namely, the fact that the trade has been carried on on his behalf, *i. e.*, that he stood in the relation of principal towards the persons acting ostensibly as the traders, by whom the liabilities have been incurred, and under whose management the profits have been made. * * I can find no case, in which a person has been made liable as a dormant or sleeping partner, in which the trade might not fairly be said to have been carried on for him, together with those ostensibly conducting it, and when therefore he would stand in the position of principal towards the ostensible members of the firm as his agents. This was certainly the case in *Waugh* v. *Carver*, 2 H. Bl. 235. There, Messrs. Carver, who were ship agents at Portsmouth, agreed with Giesler, a ship agent at Plymouth, that, if he would establish himself as a ship agent at Cowes, they would share between them the profits of their respective agencies in certain stipulated proportions. When, therefore, Giesler, in pursuance of the agreement, did establish himself at Cowes and there carry on the business of a ship agent, he in fact carried it on for the benefit of Messrs. Carver as well as of himself; and the court held that, in these circumstances, the stipulation which they had entered into, that neither party to the agreement should be answerable for the acts of the other, was a stipulation which they could not make, so as thereby to affect third persons. Each firm was carrying on business on account not only of itself, but also of the other firm: this, therefore, made each firm the agent of the other."

By " taking a part of the profits," DEGREY and EYRE may have meant (if their meaning reached a mature and definite shape) " taking a part of the profits as a principal; " and their idea of creditors relying on profits for the payment of their debts may have been a generality too crude, superficial, and vague to be practically applied to the details of evidence, or to any specific point of a case. Whatever they meant, it is certain they did not mean that a creditor relies on or takes a part of the net profit left after he is paid, or that a creditor, taking part of the gross profit, as a creditor, in payment of his debt, thereby becomes

liable to other creditors. What else could they mean except estoppel, or taking profits as a principal? Profit is generally the great object in forming both the relation of creditor and debtor, and the relation of partners. The question in this class of cases is, whether the relation between the defendants is that of creditor and debtor, or that of partners, *i. e.*, joint principals and mutual agents. If a defendant takes a profit as a creditor, he is a creditor: if he takes it as a principal, he is a principal. It is natural to inquire in which capacity he takes it, because it is the object of the business: he takes it in one capacity or the other, and usually the one in which he takes it is plainly pointed out by the circumstances of the case.

*Wilkinson* v. *Frasier*, 4 Esp. 182 (1802), was assumpsit, brought against the captain of a whale ship, by a sailor, to recover his share of the produce of a whaling voyage. By the articles, the proceeds of the voyage were to be divided in certain proportions between the owners of the ship, the officers, and crew. The proportion of a common sailor was a one hundred and ninetieth part. At the trial, the defendant objected that the action could not be maintained because the plaintiff and defendant were to be paid out of the profits of the voyage, and were therefore partners. But "Lord ALVANLEY said, He would not nonsuit the plaintiff on such an objection: That the plaintiff, and the other sailors, were hired by the defendant and the owners, to serve on board the ship for wages to be paid to him; and the share was in the nature of wages, unliquidated at the time, but capable of being reduced to a certainty on the sale of the oil, which had taken place: and that he should not therefore consider them as partners, but as entitled to wages to the extent of their proportion in the produce of the voyage." There was a verdict for the defendant. This case only shows there was no partnership *inter sese:* but all the authorities agree that, in such a case, the sailors are not partners as to third persons, and are not liable for the implements they use or the food they consume. *Mair* v. *Glennie*, 4 M. & S. 240, 244; *Rice* v. *Austin*, 17 Mass. 197, 206; Parsons on Part. 81, *n.* They do substantially the whole work of the voyage; they, and the officers and owners of the ship, are to have shares ("casual, indefinite, and depending on the accidents of" the business) of the profits of their labor and capital invested in what is, in a certain sense, a common enterprise and joint concern: yet the sailors are not partners *inter sese* or *quoad alios*, because they neither share in the profits, nor have anything, nor do anything in the business of the voyage, as principals. They are to have shares of the profits as creditors, not as partners.

*Hesketh* v. *Blanchard*, 4 East 144 (1803), was assumpsit for money paid. The plaintiff had bought goods, on the credit of himself and the defendant's testator (Robertson), to be disposed of by Robertson, the profit to be equally divided between them. The plaintiff brought this action to recover what he had paid for the goods. A verdict was taken for the plaintiff by consent, subject to the opinion of the court. The objection, that the action could not be maintained because the plaintiff

was a partner with the defendant's testator, was overruled. " Lord ELLENBOROUGH, C. J. The distinction, taken in *Waugh* v. *Carver and others*, applies to this case. Quoad third persons it was a partnership; for the plaintiff was to share half the profits. But as between themselves, it was only an agreement for so much, as a compensation for the plaintiff's trouble, and for lending Robertson his credit." The remark about partnership *quoad* third persons, is a *dictum*. The decision is, that the plaintiff was to have a share of the profit, "as a compensation," in the capacity of a creditor, not in the capacity of a partner. It would seem that the capacity in which he was to have a share depended on the understanding of the plaintiff and Robertson, and that their understanding was a question of fact for the jury. The *dictum*, if correctly reported, and taken literally, is, that ELLENBOROUGH, glancing at *Waugh* v. *Carter*, inconsiderately took it for granted that EYRE meant that every creditor, properly taking a part of the fund on which all creditors rely, becomes thereby liable, as a partner, to all the other creditors: in other words (as this liability must arise from the creditor's right to rely on and take a part of that fund, and not from his taking a part of it), *inter sese*, every partnership firm consists of all the actual partners, but, *quoad* the creditors of the firm, it consists of all those actual partners and all those creditors turned into constructive partners by a fiction of law. If the *dictum* is to be taken not literally, but as meaning that " the plaintiff was to share half the profits " as a principal, it is unobjectionable. If it is a loose generality, too vague for practical use, it need not be considered.

*Dry* v. *Boswell*, 1 Camp. 329 (1808), throws a light upon the meaning of ELLENBOROUGH in *Hesketh* v. *Blanchard*. It was "Assumpsit for work and labour, and materials in and about the repairs of a lighter. Plea, the general issue. There was no doubt as to the repairs being done; and the only question was, whether the defendant was liable for them. The witnesses first stated that the lighter was the sole property of a person of the name of Russell; that she was let out by him to the defendant, who worked her; and that the two shared her *profits* equally between them. Lord ELLENBOROUGH said, in that case the defendant was to be considered a partner, and was jointly liable for the repairs done to the lighter : there was here a participation of profit and loss, which constituted a partnership. But the agreement with Russell subsequently appeared to be this, that the defendant, in consideration of working the lighter, should receive half her *gross earnings*, and that Russell, as owner, should receive the other half. Lord ELLENBOROUGH observed that this was only a mode of paying the defendant wages for his labour, and was different from a participation of profit and loss; so that under these circumstances no partnership could be considered as existing between him and the owner of the lighter." When it appeared that the defendant was entitled to a share of net profits,—a fund which a creditor, as such, cannot be entitled to a share of, and cannot rely upon,—ELLENBOROUGH held him to be a partner : when it appeared that he was entitled to a

share of gross earnings,—a fund which a creditor, as such, may be entitled to a share of, and may rely upon,—ELLENBOROUGH held him to be a creditor and not a partner. This was a repudiation of the theory of deriving partnership liability from taking a part of the fund on which creditors rely. The defendant must have been either a creditor or a partner. If he had been entitled to a share of the net profits, the meaning and existence of that fund imply that all creditors have been paid, and that any person entitled to a part of it must be a partner. Lord ELLENBOROUGH probably did not have this view distinctly and fully in his mind: but when he held that the defendant, receiving half the gross earnings, received them as " wages for his labour," *i. e.*, received them in the capacity of a creditor, he clearly presented the distinction between a creditor and a partner (which distinction is necessarily the test of liability in such cases), although he took the place of the jury in deciding a question of fact. Whether the defendant was to receive half the gross earnings in the capacity of creditor or joint principal, depended on the understanding of the defendant and Russell; and that understanding was a question of fact.

*Wish* v. *Small*, 1 Camp. 331 (1808), exhibits the distinction between a partner's and a creditor's share of profits: but the understanding of the parties on that point appears to have been inferred from the evidence by the judge, and not left to the jury as it should have been.

*Ex-parte Garland*, 10 Ves. 110 (1804), a bankruptcy case, was a petition by the assignees of Margaret Bellman, a widow, whose husband had by will directed her, as executor and trustee, to continue to carry on his business, the profits to be applied for her own use and the maintenance and education of his children. The widow, continuing the business, became a bankrupt; and this petition was for an order declaring the whole of the personal estate liable to the debts contracted by her in carrying on the trades of a miller and farmer under the directions of the will. Lord ELDON refused to make the order.

*Barton* v. *Hanson, Tibbs & a.*, 2 Taunt. 49 (1809), was an action brought to recover the price of some hay and corn. The defendants " were generally concerned as proprietors of a stage-coach running from Hastings to London. They divided the road between themselves into different quarters; and the separate proprietors were severally the owners of the horses which drew the coach through their respective districts, and of the harness; and severally provided their stabling, food, and horse-keepers in those districts. The defendants, Hanson and Tibbs, were the proprietors of the horses which drew the coach in the Lamberhurst quarter. * * None of the other partners had any property in these horses, or contributed to furnish them with corn or hay. The goods in question were delivered for the use of these horses" at a stable owned by the plaintiff and occupied by Hanson. " The profits arising from the coach were divided among the defendants in proportion to the number of miles which they respectively drew it. BEST, Serjt., for the defendants, contended, on the authorities of *Savile* v. *Robertson*, 4 T. R. 720, and *Coope* v. *Eyre*, 1 H. Bl. 37, that the

defendants were not all jointly liable, and that the plaintiff, therefore, must be nonsuited; but the judge (MACDONALD, C. B.) left it to the jury to decide, whether the plaintiff gave credit to Hanson and Tibbs only, or to the whole concern, for that the particular arrangement made between the partners might not be notorious to all the world; and since all the parties proportionably shared the general profits of the business, all might be liable to pay for the goods furnished for the purpose of producing that profit; and it was more probable that the plaintiff should be willing to give credit to the whole concern than to a particular individual." The jury found a verdict for the plaintiff. On the defendants' motion for a new trial, the plaintiff argued that this mode of subdividing the work of a coach on a long road was very common; that the entire partnership which has the benefit of goods bought under such circumstances, upon every adjustment of the partnership account, pays for them as part of their general outgoings. And this, he suggested, was the mode of conducting the business between these partners. But the court of common pleas,—MANSFIELD, HEATH (who delivered an opinion in *Coope* v. *Eyre*, and in *Benjamin* v. *Porteus*, and concurred with EYRE in *Waugh* v. *Carver*), LAWRENCE, and CHAMBRE,—" without hearing BEST, were clear that the evidence, as stated, left no ground for this supposition," and set aside the verdict.

This case, as reported, is a strong authority against a sharing-profit test. The remark of the chief baron, at the trial, that, as all the defendants shared the general profits, " all might be liable to pay for the goods furnished for the purpose of producing that profit," in view of the authorities already examined, seems to present the idea that all the defendants were liable if they shared the profits of the entire stage line, from Hastings to London, as joint principals; otherwise, not. The case seems distinctly to show that, in 1809, *Waugh* v. *Carver* was not understood by the eminent counsel, nor by the judges, who might be supposed to understand the reported decisions of their own court, to establish a sharing-profit test. At the trial of *Waland* v. *Elkins* (1 Stark. 272), before GIBBS, C. J., in 1816, " BEST, Serjt., referred to the case of *Barton* v. *Hanson*, 2 Taunt. 49, in which it had been held that for corn supplied for the use of the horses of a stage-coach belonging to several proprietors, but horsed severally for specific stages, that proprietor alone was liable who supplied the horses by which the corn had been used." But GIBBS, C. J., said,—" I recollect the case very well, but the decision there turned upon the inferior contract (if I may so term it) between the parties. In that case there was a particular contract between the parties, and it was known in what situation they stood with respect to each other. Such contracts are binding upon the parties, but they make no difference in their relation to the public." From what is said in another report of *Waland* v. *Elkins* (Holt, N. P. 227), it seems that GIBBS held the defendant to be a partner with one Dyson *inter sese;* and perhaps he understood the defendants in *Barton* v. *Hanson* were partners *inter sese*, and therefore partners *quoad alios*, except so far as others were aware of their agreement that each should

feed his own horses at his own expense. In the statement of the facts and the charge of the judge, in *Barton* v. *Hanson*, the defendants are spoken of as "partners," as if, in some sense or other, definite or indefinite, they were understood to be partners: but the report does not show that it was an admitted or proved fact that the plaintiff knew that the defendants severally fed their own horses, not at their joint expense. It was held there was no evidence of their feeding them at their joint expense. At the trial the judge observed " that the particular arrangement [meaning apparently the arrangement for severally and not jointly feeding the horses] made between the partners might not be notorious to all the world;" and, for that reason, he " left it to the jury to decide whether the plaintiff gave credit to Hanson and Tibbs only, or to the whole concern," giving the jury his opinion that it was more probable that the plaintiff gave credit " to the whole concern," than to Hanson and Tibbs only; from which it may be inferred the plaintiff knew there was a " whole concern" of which Hanson and Tibbs were a part: and if the plaintiff, being aware of that fact, elected to sell to Hanson and Tibbs on their credit solely, he might not have a right of action against those whose credit he rejected: but if the defendants conducted their business in such a manner as to inform the plaintiff of their partnership, and to cause him to sell hay and corn to two of them on the credit of all, they would be estopped to set up against him their private agreement to feed their horses severally, not at the joint expense.

In other cases, *Barton* v. *Hanson* has been understood to be an authority against a sharing-profit test. In *Wilson* v. *Whitehead*, 10 M. & W. 503 (1842), PARKE, B., spoke of " the ordinary case of coach proprietors, where each horses the coach for one or more stages, and each agrees to bring into the concern the work and labour of his horses, and none of the others has any interest in them, though all share in the profits." Upon counsel suggesting that " Those cases proceed on the ground that it is notorious to all that each does so work with his own horses," PARKE replied, " Not at all; but on the ground that such is the authority given,"—that is, on the ground that the proprietors do not authorize each other as agents to buy for all as joint principals or partners. In *Kilshaw* v. *Jukes*, 3 B. & S. 847, 871, 872 (1863), WIGHTMAN, J., in a written opinion, questioning the decision in *Wilson* v. *Whitehead*, spoke of the case " of stage-coach proprietors, where each horses the coach with his own horses for one or more stages, in which case the proprietors of the coach are not jointly liable for provender supplied to the horses of each, as decided in *Barton* v. *Hanson*, 2 Taunt. 49," without expressing any doubt of the soundness of the decision or the accuracy of the report of the latter case.

In *Gouthwaite* v. *Duckworth & a.*, 12 East. 421 (1810), Duckworth was held to be a partner with the other two defendants, and liable to the plaintiff for goods sold, on the ground that he was to share the profit and loss of a joint adventure, and the goods were bought of the plaintiff for all the defendants as joint principals in the adventure.

In *ex parte Hamper*, 17 Ves. 403, 404 (1811) (a case which suggests that in bankruptcy and equity practice, where law and fact are often mingled, and decided by the court without a jury, the distinction between law and fact is apt to be obscured or obliterated), Lord ELDON said,—" The cases have gone farther to this nicety, upon a distinction so thin that I cannot state it as established upon due consideration, that, if a trader agrees to pay another person for his labor in the concern a sum of money, even in proportion to the profits, equal to a certain share, that will not make him a partner; but if he has a specific interest in the profits themselves, as profits, he is a partner." And two days afterwards, in the same case (p. 412), he said,—" The ground as to third persons is this : It is clearly settled, though I regret it, that, if a man stipulates that, as the reward of his labor, he shall have, not a specific interest in the business, but a given sum of money, even in proportion to a given *quantum* of the profits, that will not make him a partner; but, if he agrees for a part of the profits as such, giving him a right to an account though having no property in the capital, he is, as to third persons, a partner; and, in a question with third persons, no stipulation can protect him from loss." In *ex parte Rowlandson*, 1 Rose 89 (1811), the same judge said it was settled " that, if a man, as a reward for his labor, chooses to stipulate for an interest in the profits of a business, instead of a certain sum proportioned to those profits, he is as to third persons a partner." In other subsequent cases,—*ex parte Langdale*, 18 Ves. 300, 301 ; *ex parte Watson*, 19 Ves. 459, 461 ; *ex parte Gellar*, 1 Rose 297 ; *ex parte Wilson*, in the matter of *Colbeck*, 1 Buck 48, 52),—ELDON is reported to have dropped remarks which, without the explanation of his meaning given in *ex parte Hamper*, might be supposed to indicate that he regarded an unqualified sharing-profit test as settled law. The distinction which, in *ex parte Hamper*, he recognized as settled, and by which his language in subsequent cases is to be interpreted, is the distinction between a person entitled to a sum equal to a share or fractional part of the profits (" casual, indefinite, and depending on the accidents of trade," as described by BLACKSTONE) (" generally and indefinitely," according to EYRE) " as the reward of his labor," who, on the one hand, is not a partner, and a person who " has a specific interest in the profits themselves, as profits," " profits, as such, giving him a right to an account," who, on the other hand, is a partner.

ELDON'S description of the person who is not a partner is a plain description of a creditor. "As a reward of his labor " is an illustration thrown in to apply the description to one class of creditors as an example. His description of the person who, he says, " is a partner," is a description of a partner. His " specific interest in the profits " is the same as DEGREY'S " specific lien upon the profits." " Profits themselves, as profits," of course are meant to be contrasted with profits, not as profits, but as something else. What else can they be (when somebody is entitled to them not as profits) but profits as a reward of labor, as compensation for anything as the payment of a debt, as the

satisfaction of the claim of a creditor, as the performance of a contract not of the partnership class, or as damages recoverable in an action of law ?   The case of an heir or legatee entitled to a share of profits, does not impair the.distinction between a partner's right to profits as his profits, and a creditor's right to his debtor's profits as payment of a debt.   " Profits as profits," and " profits not as profits," are expressions fully justified .by the analogies of the law.   The question may arise whether provisions furnished to a pauper by an overseer of the poor, were furnished by the overseer as overseer, or as a private individual. It may be disputed whether some one used a highway as a highway, or as a pasture, lumber-yard, or play-ground.   " It is the duty of towns to keep their highways in suitable repair only for the travel passing thereon, and it is only to the traveller, as such, that the duty can be said to be owing."   The statute gives " the traveller, as such," " a remedy only for such injuries as may happen in the use of the the highway as such."   *Ball* v. *Winchester*, 32 N. H. 435, 444.   A person who is a common carrier, may also be a warehouseman or depositary ; and to speak of a common carrier having goods in his possession, under some circumstances, as a common carrier, and being liable as such, and, under other circumstances, having the same goods in his possession as a depositary, and being liable as such, is to use ordinary language.   In Lord ELDON's mind, the distinction which he accepted as established by authority was involved in some degree of vagueness and obscurity that prevented his appreciating its full force ; for he characterized it as " thin," which he would not have done had he clearly seen that it was the distinction between a creditor and a partner.   He seems not to have fully realized its breadth ; but he recognized it as " settled " by decided cases.   If he referred to reported cases, we know what they are : if he referred to unreported ones, they corroborate those that are reported.

It was natural for a chancellor to refer to a bill in equity for an account of profits as one of the rights of a partner.   But as such a bill may be maintained by persons not partners, and not liable as partners, it is not a test of partnership liability.   " In cases where there is a remedy at law, there is no small confusion and difficulty in the authorities " as to equity jurisdiction of account.   There are English authorities which assert that it exists where discovery is material, necessary, and effectual.   But " there are other authorities in the English courts which conflict with this doctrine ; and which, without attempting to lay down any rule for a practical discrimination as to cases within and cases without the jurisdiction, seem to deliver over the subject to interminable doubts.   The doctrine now generally (perhaps not universally) held in America is, that in all cases where a court of equity has jurisdiction for discovery, and the discovery is effectual, that becomes a sufficient foundation upon which the court may proceed to grant full relief."   1 Story Eq., secs. 455, 456.   Where a salary is payable to a.servant in proportion to the profits of his employer, the question whether the servant has a right to go into equity for an account and payment, in lieu of suing at law, depends upon whether

the accounts are of a too complicated nature to be gone into by a jury. *Harrington* v. *Churchward*, 6 Jurist, N. S. 576. If an explanation of the right to a share of " profits as profits " is needed, it is not to be found in any such exquisite uncertainty as " a right to an account." A degree of complication of accounts, too great, as a matter of fact, in· the opinion of a court of equity, in each particular case, to be conveniently or satisfactorily disentangled by a jury, would be a novel legal test of partnership.liability. If any attempt has ever been made to hold a man's creditors liable to each other for his debts on any theory of that kind, it is not ·generally known. The right of a partner to an account, is a part of ELDON'S description of a partner : but a right to an account is not a test of partnership liability, to be given to a jury as a rule of law. If it were given to them, what luck would they have in understanding and applying it.?

In *Wightman* v. *Townroe*, 1 M. & S. 412 (1813), executors improperly continued to carry on the partnership business of the testator for the benefit of his infant daughter. The legal title was in them. They bore profit and loss for the infant, not for themselves. The infant could not be a principal. They were the principals personally liable for the debts. In *Meyer* v. *Sharpe*, 5 Taunt. 74 (1813), the court, from certain circumstances, drew the inference of fact that the intention of. certain persons interested in an adventure, and sharing the profits of it, was, that they were not partners.

*Waland* v. *Elkins* (1 Stark. 272—S. C., Holt, N. P. 227, 1816) was an action on the case against the defendant, the proprietor of a wagon, for the negligence of his servant, the driver, who had driven the wagon against a cart which stood in a public street, and had forced the cart against the plaintiff's shop window, which was thereby broken. The defendant and one Dyson were carriers from London to Gosport. The defendant provided the wagon. Dyson found horses and drivers from London to Farnham : the defendant found horses and drivers from Farnham to Gosport. When the plaintiff's window was broken, the wagon was drawn by Dyson's horses ·driven by Dyson's servant, who was hired and paid by Dyson, and with whose employment the defendant had no concern whatever. At the trial, GIBBS, C. J., is reported to have said,—" The action is maintainable on this principle : the wagon belongs to Elkins ; he has the profit of the carriage. On what terms he engages with other persons to horse the wagon, we cannot tell. It is sufficient that he is found to be a partner in a common concern, and jointly interested with Dyson in the profits. It is of no importance how Elkins and Dyson apportion the carrying business between them. The servant is engaged to drive the wagon for Elkins, as well as for his immediate employer Dyson. Though by the subordinate contract between the partners he is the servant of one, yet, in the contemplation of the law, and for all purposes of legal responsibility, he is in the employ of both." The report does not show that the question of partnership was passed upon in this *nisi prius* ruling. The judge seems to have taken it for granted that the defendant evidently

was, in some sense or other, "a partner in a common concern, and jointly interested with Dyson in the profits," and to have held that consequently Dyson's servant was driving the wagon for the defendant as well as for Dyson. It is not improbable that the doctrine of the overruled case of *Bush* v. *Steinman*, 1 B. & P. 404 (*Wright* v. *Holbrook*, 52 N. H. 120) had an influence in promoting a loose notion that the relation of principal and agent existed between the defendant and Dyson's servant, because Dyson's servant was, in a certain sense, driving for the defendant's benefit. The doctrine of holding a man liable as a partner, who takes a share of profits, if it is recognized by the authorities, stands on the ground that he takes a part of that fund on which creditors rely for payment when they give credit. Did Waland's reliance on the profits cause his window to be broken by Dyson's careless servant?

*Cheap* v. *Cramond*, 4 B. & Ald. 663 (1821), was decided upon the authority of *Waugh* v. *Carver*. ABBOTT, C. J., delivering the opinion of the court, said the principle of the decision in *Waugh* v. *Carver* was, "that where two houses agree that each shall share with the other the money received in a certain part of the business, they are, as to such part, partners with regard to those who deal with them therein, though they may not be partners *inter se*. By the effect of such an agreement, each house receives from the other a part of that fund on which the creditors of the other rely for payment of their demands, according to the language of Lord Chief Justice DE GREY in the case of *Grace* v. *Smith*, 2 Sir W. Black. 998. And such an agreement is perfectly distinct from the cases put in the argument before us, of remuneration made to a traveller, or other clerk or agent, by a portion of the sums received by or for his master or principal, in lieu of a fixed salary, which is only a mode of payment adopted to increase or secure exertion." And he mentioned other instances where, as a matter of fact, the relation of creditor and debtor, and not the relation of partners, would be inferred. The decision practically amounts to this: "*Waugh* v. *Carver* is conclusive authority: it establishes the principle that persons sharing profits are partners, except in those cases in which they are creditors: whether they are creditors or partners, the court, invading the province of the jury, decide as a question of fact upon the evidence in each particular case." The publication of such decisions tends to confusion, because, while they lay down no legal rule, they are not announced and reported as decisions of questions of fact.

In *Fromont* v. *Coupland*, 2 Bing. 170 (1824), there was no controversy about the plaintiff's claim. The only question was, whether the defendant could set off against it his own claim against the plaintiff. The plaintiff and defendant had "been engaged in running a coach from Bath to London, the plaintiff finding horses for one part of the road, and the defendant for another, and the profits of each party were calculated according to the number of miles covered by his own horses. The plaintiff received the fares, and rendered an account

thereof to the defendant every week. Upon this weekly account there was a balance due to the defendant of 256*l.* It did not appear, however, that any final account had been stated, or that the plaintiff had made any promise to pay the balance " which the defendant set up as a claim to be allowed as a set-off. It was held that this claim could not be allowed. The defendant argued that the set off ought to be allowed : first, because the parties were not partners (citing *Barton* v. *Hanson,* 2 Taunt. 49) ; secondly, even supposing them to have been partners, there was an adjustment of the account, upon which either partner might have sued the other, even though there had been no special promise to pay. The first question was, whether the parties were partners *inter sese.* On that question, BEST, C. J., says,—"according to the case of *Barton* v. *Hanson,* these parties are partners, though no authority was requisite to prove that, because both are engaged in carrying the same passengers ; they divide the profits, and are answerable to the public jointly." Counsel cite *Barton* v. *Hanson,* volume and page, as such an authority as the report of that case shows it to be : BEST (who was counsel in that case) is reported as citing it in support of the contrary doctrine, without suggesting that it was erroneously reported. In *Waland* v. *Elkins* (1 Stark. 272), BEST, as counsel, relied on the report of *Barton* v. *Hanson ;* and GIBBS, C. J., who said he recollected the case very well, suggested, not that the report was the opposite of the decision, but that the ground of the decision was the (unreported) fact that it was known that the parties severally fed their own horses. If the decision was one way and the report the other, the court in which the decision was made could hardly have avoided explaining the mistake, when the report was relied upon in argument. BEST is of opinion that no authority is requisite to prove that the parties are partners, " because both are engaged in carrying the same passengers ; they divide the profits, and are answerable to the public jointly. In such a case as *Fromont* v. *Coupland,* the parties might conduct their business in such a joint manner as to satisfy a jury that they were in fact joint principals and mutual agents in that business, or that they held themselves out as such, and were estopped, as against a third person, to deny the actual existence of the apparent partnership relation which had obtained credit from that third person. BEST draws an inference of fact which a jury might draw. He infers the relation of partners, " because both are engaged in carrying the same passengers." Why name such a fact as a reason for his opinion, if he is laying down sharing-profits as a legal test ? In other cases, as well as in this, when sharing-profits is relied upon, it is coupled, as an item of evidence, with other circumstances,— the whole being competent evidence on the question of partnership as a question of fact.

In *Smith* v. *Watson,* 2 B. & C. 401 (1824), one question was, whether Gill, who was to have a share of profits, was a partner with Sampson, *inter sese,* in regard to certain property. Among the remarks of Mr. Justice BAYLEY are the following : " It is said that the jury ought, up-

on the evidence, to have found that Gill was a partner in this property; I think, however, that the inference is the other way. All the witnesses speak of Gill as a broker, who was to be paid for his trouble in a particular way, viz., by a share of the profits. Now, a right to share in the profits of a particular adventure may have the effect of rendering a person liable to third persons as a partner, in respect to transactions arising out of the particular adventure in the profits of which he is to participate; but it does not give him any interest in the property itself, which was the subject-matter of the adventure." HOLROYD, J. (holding, with BAYLEY, J., that sharing-profits did not make Gill a partner in the ownership of the property, because it would be contrary to the intention of the parties to construe an agreement for sharing-profits to have the effect of conveying an interest in the property itself), said,— "It may, indeed, by a general rule of law, founded upon reasons of policy, render him liable, as a partner, to third persons." BEST, J., said,—"I am clearly of opinion that Gill had not any joint interest in this property. The question is, not whether he is liable to third persons as a partner, but whether he had such joint interest. There are many cases where a person may be liable to third persons as a partner, and yet not have any interest in the property. Thus, a person who retires from a house of trade, and suffers his name to continue in the firm after he has ceased to be an actual partner, is liable to the world as a partner, although the property belongs entirely to other persons. * * All the evidence shows that Gill was to act merely as a broker, and not to appear as a partner; he, therefore, would not be liable to the engagements entered into in the course of the transaction." There may be some doubt whether the *dictum* of BAYLEY, repeated by HOLROYD, that sharing profits may render a person who is not a partner, liable as a partner, meant that profits may be shared in such a manner as to call for the application of the general rule of estoppel illustrated by BEST in the same connection; or whether it referred to *Grace* v. *Smith*, *Waugh* v. *Carver*, and taking a part of that fund on which creditors rely; or whether it was an impalpable generality. But there is no doubt that *dicta* of that kind have done much to propagate an uncertain, loose, and visionary notion of a sharing-profits test of partnership liability.

In *Dickinson* v. *Valpy*, 10 B. & C. 128 (1829), there was a partnership called the Cornwall and Devonshire Mining Company, organized with directors, treasurer, and secretary, and with shares of stock, like a corporation. The action was brought to hold the defendant as a partner by the plaintiff, as endorsee of a bill of exchange drawn by the company on itself. The defendant had applied to the secretary for thirty shares, and ten were appropriated to him. Upon these shares he paid an instalment of 5*l*. per share, and received script receipts. He afterwards paid a second instalment of 10*l*. per share, signed a deed, and attended a meeting of the shareholders. At the trial before BURROUGH, J., the defendant objected, first, that there was no evidence to show that the defendant ever actually became a partner in interest,

or held himself out to the world as a partner; secondly, assuming that he was proved to be a partner, there was no proof that the directors had authority to bind the shareholders by drawing or accepting bills. The judge was of opinion that there was sufficient proof to make the defendant liable as a partner: the question of the directors' authority was reserved: a verdict was found for the plaintiff: the verdict was set aside, and a nonsuit ordered by the King's Bench. The principal ground of the decision was, that there was no evidence that the directors or members of mining partnerships in general, or this one in particular, were authorized, either expressly or by implication from the usage, nature, or necessity of the business, to bind the firm by notes or bills. PARKE, J., expressed his opinion on the question whether there was sufficient evidence to go to the jury that the defendant was a partner, in which he said,—"The bill was not drawn or accepted by the defendant himself, and therefore the plaintiff was bound to show that the defendant, either expressly or impliedly, authorized the drawing or accepting of the bill of exchange.   *   *   There is no pretence to say that there was any express authority to draw or accept this bill of exchange; and there is no pretence to say that the drawing or accepting of this bill was subsequently ratified by the defendant; and, therefore, the plaintiff proposes to show that there was an implied authority, and that implied authority, it is said, arises from the relation of partner.   *   *   The plaintiff, therefore, must begin by showing that the defendant stood in the situation of complete partner. He says, I can show that; in the first place, because the defendant has represented himself to be so. And if it could have been proved that the defendant had held himself out to be a partner, not ' to the world,' for that is a loose expression, but to the plaintiff himself, or under such circumstances of publicity as to satisfy a jury that *the plaintiff* knew of it, and believed him to be a partner, he would be liable to the plaintiff in all transactions in which he engaged and gave credit to the defendant, upon the faith of his being such partner. The defendant would be bound by an indirect representation to the plaintiff, arising from his conduct, as much as if he had stated to him directly and in express terms that he was a partner, and the plaintiff had acted upon that statement. There is, however, no reason in this case to say that the defendant ever held himself out to the world, still less that he held himself out, either directly or indirectly, to the plaintiff, as a partner. Therefore, upon the ground of representation, he is not liable. It is next said that he was bound, because he was, in point of fact, a partner.   *   *   In those cases in which a plaintiff has not been induced by the defendant's representation *to give credit to him*, but seeks to fix him because he has *really authorized* the contract to be made, the plaintiff must show that authority."

This idea of authority as the test of partnership liability (when there is no estoppel, and the person sought to be charged on a contract, did not make it in person), is the idea of the liability of A, on a contract made by B, authorized by A to make it for and in behalf of A, *i. e.*, the

liability of a principal on the contract of his agent. In *Beckham* v. *Drake & a.*, 9 M. & W. 79, 97, 98 (1841), "Drake was a dormant partner with the other defendants," Knight and Surgey; and the question was, whether he was liable to the plaintiff on a written contract signed by his partners, he not being named in it. PARKE, B., said,— "Inasmuch as the defendant Drake has not subscribed this instrument with his own hand, it must be made out that he is a party to it in point of law, and that he authorized Knight and Surgey to sign it on his behalf. I think that is shown by the fact of his being a partner in the trade, and sharing the profits of it. Being a dormant partner, he authorizes the ostensible partners to enter into such contracts as are usually entered into in the course of such a business. Then the question will be, whether this contract is of that description. I see no reason to doubt that it is, being a contract fairly and reasonably entered into for the purpose of employing and retaining the workmen necessary to carry on such a concern. * . * There was an implied authority communicated by the defendant to his partners to enter into this agreement. But * * it is necessary to make out that the partners meant to pursue that authority, and meant to make a contract on behalf of their copartner Drake and themselves, in order to make the partnership liable. That is rather a question of fact than of law; and the facts which are submitted for the consideration of the court, from which to draw that inference, are sufficient, in my opinion, to enable us to come to the conclusion that the contract was for the benefit of the partnership. * * All those propositions which are necessary in point of law to be proved, in order to render the defendant Drake liable, are made out in the present case; and, judging from the whole evidence taken together, I think Drake was bound, and that the result is that he is liable upon this contract. If the plaintiff entered into the contract in ignorance of Drake being a real partner, the case would be within the same principle of law which applies to the introduction of a principal before unknown, where the party who contracted, upon the supposition that the agent was the principal, is entitled to all the same benefits and rights, and stands precisely in the same situation, as he would have been if he had been aware of the real principal. For all questions between partners are no more than illustrations of the same questions as between principal and agent." In *Ernest* v. *Nicholls*, 6 H. L. Cas. 401, 417 (1857), Lord WENSLEYDALE said,—"The law in ordinary partnerships, so far as relates to the powers of one partner to bind the others, is a branch of the law of principal and agent.

When, in 1860, in *Cox* v. *Hickman*, 8 H. L. Cas. 268 (S. C., 9 C. B. (N. S.) 47, 88–102), it was held by CAMPBELL, BROUGHAM, CRANWORTH, WENSLEYDALE, and CHELMSFORD, that "The liability of one partner for the acts of his copartner is, in truth, the liability of a principal for the acts of his agent;" that "The law as to partnership is undoubtedly a branch of the law of principal and agent;" that upon the question of agency—the question of the authority of one person as agent to make a contract binding another as principal—"we must look at the real

nature of the transaction, according to the understanding of" the persons alleged to be principal and agent,—it was not a new doctrine those venerable jurists declared. WENSLEYDALE, as a law lord, and as Mr. Baron PARKE of the court of exchequer, and as Mr. Justice PARKE of the King's Bench, had been repeating it for more than thirty years, without any suspicion that he was broaching a novelty.

*Fox* v. *Clifton*, 6 Bing. 776 (1830), was assumpsit against seven defendants to recover a debt due the plaintiff from the "Imperial Distillery Company," the plaintiff claiming to hold the defendants as partners. It was tried before TINDAL, C. J., who submitted to the jury three questions: "1st, Whether, when the contract was entered into with the plaintiff, all the defendants were, as partners, entitled to a share of the profits of the concern: 2dly, Whether, if this were an inchoate partnership, the defendants had legally withdrawn themselves from the concern before the partnership was complete: 3dly, Whether, in such case, they had held themselves out as partners." The first question recognizes a distinction between being entitled to a share of the profits "as partners," and being entitled to a share not as partners. The jury found a verdict for the plaintiff, which the court set aside on the ground that, under the circumstances proved, the directors had no authority to bind the defendants. TINDAL, C. J., delivering the opinion of the court (after holding there was no evidence of an estoppel) upon the main question whether the defendants were actually partners, said,—"The question, therefore, becomes this, Whether, at the time of this contract made by the directors, the relation between the defendants and them was such that the directors were constituted the agents of the defendants to bind them by their contracts." This is the doctrine of *Cox* v. *Hickman*, stated with a precision that leaves no room for a doubt of the meaning. In the course of the opinion, the chief justice says, upon the question "whether a partnership was actually formed, we think, if the right to participate in the profits of a joint concern is to be taken, as undoubtedly it ought to be, as a test of a partnership, these defendants were not entitled at any time to demand a share of profits, if profits had been made, inasmuch as they had never fulfilled the conditions upon which they subscribed. We think the matter proceeded no further than that the defendants had offered to become partners in a projected concern, and that the concern proved abortive before the period at which the partnership was to commence: and, therefore, with respect to the agency of the directors, which is the legal consequence of a partnership completely formed, we think the directors proceeded to act before they had authority from these defendants." While he says the question of liability when there is no estoppel is the question of agency and authority, he also recognizes a sharing-profits test in the form of "the right to participate in the profits of a joint concern," meaning, by "the profits of a joint concern," the net profits of a concern of joint principals.

Upon a second trial of *Fox* v. *Clifton*, 9 Bing. 115 (1832), the jury

again found a verdict for the plaintiff, " notwithstanding the direction of TINDAL, C. J., that the facts proved did not constitute the defendants partners in the concern," nor make out an estoppel.   This verdict also the court set aside, on the ground that it was " against the legal result of the facts proved," and a new trial was granted.   TINDAL, C. J., again delivering the opinion of the court, says,—" The questions in this case submitted to the jury were not questions of mere fact, but questions in which the law and the fact were so intimately involved and combined together, that the jury cannot be said to have come to a right conclusion upon the fact, unless they are contented to take the law upon the subject from the judge who presides at the trial.   Whether particular persons have entered into a partnership together, is, indeed, when abstractedly put, a question of mere fact."   He then goes on to distinguish the law from the fact, and the province of the court from the province of the jury in such cases, without giving any explanation, that would be satisfactory in our system of practice, of the action of the court in instructing the jury and granting two new trials, instead of ordering a nonsuit.   The explanation and action of the court in that case illustrate the practical confusion of law and fact in English practice, that tends to involve legal tests in a degree of obscurity.

In *ex parte Chuck*, 8 Bing. 469 (1832), there was an undisclosed partner entitled not to " any definite aliquot proportion of the profits," but to a certain sum annually " out of the clear profits,"—" clear profits" being used in the sense of the profits left after paying all creditors.

In *Green* v. *Beesley*, 2 Bing. N. C. 108 (1835), the declaration was held bad on demurrer, because it alleged a communion of profit and loss between the plaintiff and the defendant that made them partners. TINDAL, C. J., said,—" I have always understood the definition of partnership to be a mutual participation in profit and loss."   If by " a communion of profit and loss" is meant a joint ownership of the gross profits left after making up all losses and paying all debts, it is a sufficient proof of the relation of joint principals: but the phrase is often used in a very indefinite sense.

In *Owen* v. *Body*, 5 A. & E. 28 (1836), it was held that a certain assignment for the benefit of creditors, with a stipulation for the assignees continuing the debtor's business, and appropriating the profits to the payment of such creditors as should sign the assignment, was invalid, because it might be construed to create a partnership among the creditors signing it.   Creditors were not bound to accept the assignment with the possibility of the court holding the true construction of it to be that the creditors accepting it would be interested as principals in carrying on the business.  *Janes* v. *Whitbread*, 11 C. B. 406, 417, 418, 419 ; *Coates* v. *Williams*, 7 Exch. 205, 206 ; *Cox* v. *Hickman*, 18 C. B. 617, 632, 634-638—S. C., 3 C. B. (N. S.) 523, 528, 538, 541, 558, 559—S. C., 9 C. B. (N. S.) 47, 86, 101.

In *Bond & a.* v. *Pittard*, 3 M. & W. 357 (1838), the question being whether the plaintiffs were partners, PATTESON, J., told the jury that, to constitute a partnership, there ought to be a community of loss as

well as profit. Out of the profits of the joint business of the plaintiffs, one of them was to have 300*l.* annually. The court of exchequer held them to be partners, PARKE, B., remarking that the 300*l.* was to come out of the net profits.

*Wilson* v. *Whitehead & a.*, 10 M. & W. 503 (1842), was assumpsit for paper sold and delivered; and was an attempt to hold liable, as partners, the defendants who were to share the profits of publishing a review. The chief baron, in directing a nonsuit, and the court of exchequer (ABINGER, PARKE, GURNEY, and ROLFE), in refusing to set it aside, may have taken the place of the jury in drawing an inference of fact. PARKE, B., said the question was one of authority,—"Did the other defendants authorize Whitehead to purchase the paper on their account?" This is the doctrine of agency—the doctrine of *Cox* v. *Hickman*, in the decision of which case, eighteen years afterwards, PARKE and ROLFE (as Lords WENSLEYDALE and CRANWORTH) took part.

*Pott* v. *Eyton*, 3 C. B. 32 (1846), was assumpsit by the assignees of bankrupt bankers, brought to hold the defendants, Eyton and Jones, as partners. Jones was defaulted. An agreement had been made between the defendants for opening a shop, principally with a view of supplying goods to the workmen of Eyton's colliery. Eyton built the shop, and his name was placed over the door. Jones sold the goods. Eyton received a certain per cent. of the amount of sales to his workmen; and Jones had the rest of the profits. TINDAL, C. J., left it to the jury to say, first, whether there had been a sharing of profit and loss between Eyton and Jones, so as to constitute an actual partnership; secondly, whether Eyton had been, by his own permission, held out as a partner, and his credit pledged to the bank. The jury, answering both questions in the negative, returned a verdict for the defendants; and the court being of opinion that the verdict was right, the plaintiffs' motion for a new trial, on the ground of the verdict being against the evidence, was denied. TINDAL, C. J., delivering the opinion of the court, says,—"There was no evidence to show that credit was in fact given to Eyton, or that the bankers knew that his name was over the door of the shop at Mostyn Quay, or that they supposed him to be a partner. * * We must assume, therefore, that credit was given to Jones alone; and if Eyton is to be made liable, that must be on the ground of an *actual* partnership between himself and Jones. It was contended that an actual partnership was proved, for that Eyton, by taking 5*l.* per cent. on the sales to his workmen, received a share of the profits, and was therefore, in point of law, a partner as to third persons. But we are of opinion that the taking of that money was not sufficient to make him a partner. Traders become partners between themselves by a mutual participation of profit and loss; but, as to third persons, they are partners if they share the profits of a concern; for, he who receives a share of the profits, receives a part of that fund upon which the creditors of the concern have a right to rely for payment, and is therefore to be made liable to losses, although he may have expressly stipulated for exemption from them. *Grace* v. *Smith*, 2 W. Bl.

998; *Waugh* v. *Carver*, 2 H. Bl. 235." He quotes DeGrey's "true criterion,"—"to inquire whether Smith agreed to share the profits of the trade with Robinson, or whether he only relied on those profits as a fund of payment;" says this distinction has been recognized in many cases, of which it may suffice to mention *Dry* v. *Boswell*, 1 Camp. 329, *Benjamin* v. *Porteus*, 2 H. Bl. 590, *ex parte Hamper*, 17 Ves. 404, and *ex parte Watson*, 19 Ves. 459, and concludes thus: "It appears to us, that, in the present case, the payment to Eyton was in the nature of commission on certain sales supposed to be effected through his influence over his workmen, and was not sufficient to render him, as a matter of legal inference, liable as a partner; and in so far as it was a question of fact, it was disposed of by the jury." This decision is a strong authority to the point that, when there is no estoppel, if a man is made liable to third persons, as a partner, it "must be on the ground of an *actual* partnership" *inter sese*. The court seem to have been confused, as others have been, by the specious, superficial, and unmeaning generality of *Grace* v. *Smith* and *Waugh* v. *Carver*, about taking a part of the profits, and creditors relying on the profits: but the decision is flatly opposed to the creation of a liability to third persons for taking a part of "the profits," in an undefined, undiscriminating, and unlimited sense, when there is no estoppel, and no actual partnership *inter sese*.

The remark of Parke, B., in *McAlpine* v. *Mangnall*, 3 C. B. 496, 516 (1846), that creditors, for whose benefit a debtor's assignment is made and his business continued, are not responsible as partners to persons furnishing goods for carrying on the business, may be questionable. It does not recognize a sharing-profits test of liability: but whether creditors, who become parties in such an arrangement, are joint principals in the business carried on, with their assent, for their benefit,—whether it is their business, conducted by their agents authorized to make necessary contracts binding them as principals,—is a question that is not disposed of by rejecting a sharing-profits test.

*Barry & a.* v. *Nesham* and *Lowthin*, 3 C. B. 641 (1846), was assumpsit to recover for goods alleged to have been sold to the defendants as partners in the publication of a newspaper. Lowthin was defaulted. A verdict was taken for the plaintiffs, subject to the opinion of the court upon the evidence: if the court should be of opinion that the plaintiffs were entitled to maintain the action, the verdict was to stand; otherwise, to be entered for the defendant Nesham. (In cases brought up for decision in this manner, in the English practice, the court frequently pass upon the weight of the evidence, much as if the case were tried by the court without a jury, and the distinction between law and fact is not observed; and if the court infer partnership from sharing profits, the question remains whether the inference is one of law or fact.) The plaintiffs argued that the real question was, whether Nesham was entitled to a part of the fund on which creditors relied for the payment of their debts (citing, to that point, *Grace* v. *Smith* and *Waugh* v. *Carver*), and claimed that "This court, in the recent case of

*Pott* v. *Eyton* (3 C. B. 32), distinctly recognized the principle, that one who takes a share of the *profits*, as such, of a trading concern, thereby becomes a partner as to third persons, on the ground of those profits forming a portion of the fund upon which creditors have a right to rely for payment." For the defendant, it was argued that he did " not stipulate for any part of the profits, as such." The court (WILDE, COLTMAN, MAULE, and WILLIAMS) were of opinion that Nesham was liable as a partner. WILDE, C. J., said,—" Looking at the intention of the parties to this agreement, I am unable to come to any other conclusion than that it created an interest in the profits of the concern in Nesham, which constituted him a partner, *quoad* third persons. * * All the cases seem to agree, that, whatever be the private stipulations between the parties themselves, an agreement for a participation in the profits constitutes a partnership as to third persons; for, it is but reasonable that one who stipulates for an interest in the profits should be held liable to those who supply the means of carrying on the trading concern out of which those profits are to arise. It is therefore material to ascertain what was the interest which Nesham created for himself by this agreement. He was to receive all the profits acquired by the publication of the newspaper, beyond 150*l.* *per annum,* until the 1500*l.* and interest, and 500*l.* in addition, should have been fully paid. If no profits were realized beyond 150*l.* *per annum*, he would get nothing. * * Throughout each year of the term, Nesham's right to receive anything depends upon the contingency of a fund accruing from profits. * * It seems to me, therefore, upon the simplest principles applicable to the law of partnership, that Nesham has entered into the contract under circumstances that impose upon him a liability for goods supplied for the carrying on of the concern. It would be most unjust and unreasonable that he should be permitted to take the whole profits of the publication, and not be held responsible for the debts." COLTMAN, J., said,—" A party who stipulates for a participation in profits, as such, is liable as a partner, *quoad* third persons, notwithstanding he may have expressly stipulated that he shall not be subject to losses." MAULE, J., said,—" I quite agree that we are to look at the substance, and not at the mere form, of the transaction. The question is, whether it gave Nesham an interest in the profits of the newspaper. Before the date of the agreement, the whole profits belonged to him. What does he, in substance, part with? Lowthin is to manage the concern, and to receive 150*l.* a year, at all events, for seven years. That is all that Lowthin is certain of receiving. Deduct that sum from the whole interest in the newspaper, and Nesham is interested in the excess, except in the improbable event of the profits realizing more than sufficient to pay the annual instalments of the 1500*l.*, the 150*l.* a year to Lowthin, and the further sum of 500*l.* in the seven years. Upon that simple statement, it might very well be questioned whether Lowthin was a partner, or whether he was not a sort of salaried manager, remotely interested in surplus profits. It is, however, unnecessary to discuss that, for no one disputes

the *he* is a partner. I think Nesham is a much more unquestionable partner than Lowthin."

In *Heyhoe* v. *Burge*, 9 C. B. 431 (1850), the question was, whether the defendant was liable as a partner with others, with whom, or from whom, he was to receive a share of the clear profits arising from a contract to construct a piece of railway. At the first trial, POLLOCK, C. B., told the jury that, if they believed the written agreements to be the agreements which they purported to be, "they ought to find that the defendant was interested in the profits, and consequently a partner." "The jury accordingly returned a verdict for the plaintiff," which the court (COLTMAN, MAULE, CRESSWELL, and WILLIAMS) set aside. The decision (delivered by COLTMAN, J.) was this: "It appears to the court that there was in this case a question of fact which ought to have been submitted to the jury, viz., whether the defendant had assented to the agreement of the 5th of August, 1846. We think that the omission to present that to the jury, and dealing with the whole as a question of law, was a miscarriage, and, consequently, that the rule should be made absolute for a new trial." At the second trial, Mr. Baron PARKE presided. A part of his charge to the jury occupies seven and a half pages of the report. The jury found a verdict for the plaintiff, which the court refused to set aside. PARKE "left the question to the jury *on the whole of the evidence,*—not leaving it that that instrument (the principal written agreement relied on) constituted a partnership: on the contrary, he said it would not." The reporters say that, in presenting the case to the jury, he told them that the first question for them to consider was, whether there was a partnership between the defendant and Fly and Frost,—whether he entered into a contract with them to share in the profit and loss of the particular adventure; that, if the defendant did actually agree, by a binding contract, to take a share of the profits of the adventure, in point of law he was a partner, and authorized everything that was necessary for the purpose of carrying the contract into effect, and constituted Fly and Frost his agents for the purpose of entering into any sub-contracts which might be necessary for that purpose. The report goes on to give PARKE'S own words. Among the observations appearing to be in his own language are the following: "This agreement purports to give the defendant a fourth part of the clear profits, not the gross profits of the contract. A person who shares *gross* profits is not a partner; but a person who shares *net* profits is *prima facie* to be considered as a partner.     *     * Upon the whole of the facts, taken together, the question will be, whether you are satisfied that this was a binding agreement,     *     * that the defendant should have a share of the net profits of carrying into effect this particular contract. If you are not satisfied of that, there is an end of the plaintiff's case, because the whole rests upon the inference to be drawn, of the defendant's being a partner in the profit and loss of the contract. If he is *not* a partner in the profit and loss, then the defendant is entitled to your verdict. But, if you are satisfied that he *was* a partner in the contract, then the defendant is, I

think, responsible for all the acts done by Fly and Frost, which were necessary for the purpose of carrying the contract into effect. \* \* I am of opinion that the rule of law, as to sharing net profits, is not confined to general dealings of that nature, but is also applicable to particular transactions ; that, if a person agrees to share with another, by a binding agreement, the profits of a particular adventure, they are partners in that particular adventure.    Sometimes cases arise in which a person, although he is taking a share of the profits, is not a partner for some purposes : such, for instance, is the case in the whale-fisheries :—it is well known by persons conversant with that trade, that the master, the mates, and the seamen all take a share in the ultimate profits of the voyage, proportioned to their rate of wages ; but that does not constitute them partners, so as to render them liable for articles supplied in the equipment of the vessel ; it is only a mode of remunerating them for their services.    But, where a person stipulates for a share in the net profits of a concern, and has a right to an account of the net profits as a partner, he is liable, although the partnership is limited to a single transaction or adventure.    \* \* If you are satisfied that there was this contract between Fly and Frost and the defendant, then comes the question whether Fly and Frost were authorized to enter into a contract for the work in respect of which it is now sought to charge the defendant as a partner."

Such are the most important English cases, before *Cox* v. *Hickman* (1860), relating to the subject of a sharing-profits test.    Whatever loose general notions may have been entertained as to the effect of these cases, they do not establish such a test in an unqualified form. They cannot be arrayed as a mass of authorities overruled by *Cox* v. *Hickman* and the subsequent cases, which have settled the law, for England, that sharing-profits, in a general unlimited sense, is not a test.

Neither is such a test established by a preponderance of the weight of American cases, decided without reference to *Cox* v. *Hickman*.    The subject has been much considered in Massachusetts ; and the result is far from being a simple, absolute sharing-profits test.    *Reynolds* v. *Toppan*, 15 Mass. 370 ; *Rice* v. *Austin*, 17 Mass. 197 ; *Baxter* v. *Rodman*, 3 Pick. 435; *Grozier* v. *Atwood*, 4 Pick. 234 ; *Cutler* v. *Winsor*, 6 Pick. 335 ; *Turner* v. *Bissell*, 14 Pick. 192 ; *Denny* v. *Cabot*, 6 Met. 82 ; *Bradley* v. *White*, 10 Met. 303 ; *Holmes* v. *O. C. R. R.*, 5 Gray 58 ; *Fitch* v. *Harrington*, 13 Gray 468 ; *Julio* v. *Ingalls*, 1 Allen 41 ; *Gunnison* v. *Langley*, 3 Allen 337 ; *Pratt* v. *Langdon*, 12 Allen 544—S. C., 97 Mass. 97.    Sometimes such a test seems to be recognized with the qualification " as a principal."    *Loomis* v. *Marshall*, 12 Conn. 69 ; *Berthold* v. *Goldsmith*, 24 How. 536, 542 ; Collyer on Part., Book 1, ch. 1, sec. 25 ; Story on Part., secs. 49, 54, 55.    Of course, if one shares profits " as a principal," *i. e.*, in the capacity of a principal, he is a principal ; and so he is if he does anything else in that capacity.

When sharing-profits is accepted as a test, it is almost universally with this qualification, that if the profits are received as compensation for services, or payment of any debt, sharing them is not a test.    The

number of cases that favor an unqualified sharing-profits test is hardly appreciable among the vast number opposed to it. What is said in *Bromley* v. *Elliot*, 38 N. H. 287, 305, against the compensation or creditor qualification of the test, is against an irresistible weight of authority. *Holmes* v. *O. C. R. R.*, 5 Gray 58, 60 ; *Fitch* v. *Harrington*, 13 Gray 468, 474 ; *Burckle* v. *Eckart*, 1 Denio 337, 341—S. C., 3 Const. 132, 138 ; *Heimstreet* v. *Howland*, 5 Denio 68, 70 ; *Perrine* v. *Hankinson*, 6 Halst. 181 ; Story on Part., secs. 41–49 ; Parsons on Part. 85 *n ;* Collyer on Part., Book 1, ch. 1, secs. 25–50 ; cases cited in notes of Am. ed. of 3 M. & W. 361, and 9 C. B. 458 ; 1 Smith Ld. Cas. 805, Hare & W. note. " A person may be allowed, in special cases, to receive part of the profits of a business without becoming a legal or responsible partner. Thus a party may by agreement, receive, by way of rent, a portion of the profits of a farm or tavern, without becoming a partner. So, to allow a clerk or agent a portion of the profits of sales as a compensation for labor, or a factor a percentage on the amount of sales, does not render the agent or factor a partner, when it appears to be intended merely as a mode of payment adopted to increase and secure exertion, and when it is not understood to be an interest in the profits in the character of profits, and there is no mutuality between the parties. A person in business may employ another as a subordinate, and agree to pay him a share of the profits, if any shall arise, without giving him the rights or liabilities of a partner. So, seamen take a share, by agreement with the ship-owner, in the profits or gross proceeds of a whale-fishery or coasting voyage, by way of compensation for their services ; and shipments from this country to India, upon half profits, are usual, and the responsibility of partners has never been supposed to flow from such special agreements. This distinction seems to be definitely established by a series of decisions, and it is not now to be questioned." 3 Kent Com. 33. Add together all the exceptions recognized by the authorities, and the rule amounts to this : a sharer of profits is a partner in those cases in which he is not a creditor. The original question, Creditor, or partner ? is presented by the test proposed for the solution of that question. " It is," says Judge Story, " far from being universally true, that mere participation in the profits constitutes the party a partner ; at most, it is true only *sub modo.*" Story on Part., sec. 36. A sharer of profits is a partner : that is the rule *sub modo :* he is a partner when he is not a creditor. A sharer of profits is a creditor : that is the rule *sub modo :* he is a creditor when he is not a partner.

The sharing-profits test, in this modified form, enveloped in and consolidated with its mass of qualifications and exceptions,—the only form in which it can be claimed to be established by the authorities,—is nothing but the elementary doctrine of the liability of a principal, disclosed or undisclosed, on an authorized contract made by his agent,—which is the doctrine of *Cox* v. *Hickman*, and the subsequent English cases. *Cox* v. *Hickman*, Beavan 164 ; 25 L. J. Ch. 142 ; 18 C. B. 617 ; 3 C. B. (N. S.) 523 ; 8 H. L. Cas. 268 ; 9 C. B. (N. S.) 47 ; *Kilshaw* v.

*Jukes,* 3 B. & S. 847; *Bullen* v. *Sharp,* 18 C. B. (N. S.) 614; L. R. 1
C. P. 86; *Redpath* v. *Wigg,* L. R. 1 Ex. 335; *Easterbrook* v. *Barker,*
L. R. 6 C. P. 1; *Holme* v. *Hammond,* L. R. 7 Ex. 218; *Shaw* v. *Galt,*
16 Ir. Com. Law 357; *re, E. & I. C. & U. A. S.,* 1 Hemming & Miller 85·; *Mollwo* v. *Court of Wards,* L. R. 4 P. C. 419; *Noakes* v. *Barlow,* 20 W. R. 388; 26 L. T. (N. S.) 136; *ex parte Macmillan, re,*
*Whittaker,* 24 L. T. (N. S.) 143.

In the supposed case of flour trade, where A is to have one ninth of
the profit, if it is net profit that he is to have a share of, he is to have
it, not as a creditor, but as an·owner; the net profit, in cash, specifically ascertained, identified and deposited by itself, is the joint property of A and B before it is divided; it is the residue of the proceeds
of the sales; all those proceeds, as well as that residue, were the joint
property of A and B; the flour which produced those proceeds was
their property; it was bought and sold by them as joint principals;
the title passed from C to A and B, and not to B only; B, in buying
it, acted as agent of A as well as for himself; by the contract of purchase, made by B as a joint principal and agent of A, A is bound as a
principal. If we begin with net profit, as the result and test, and
cite, in support of it, the cases usually grouped under *Waugh* v. *Carver,*
net profit leads us back to the relation of·principal and agent (the
doctrine of *Cox* v. *Hickman*) as the starting-point. If we begin with
the relation of principal and agent, it leads us forward, over the same
course, to net profit as the result. For legal and practical purposes, it
is one route.

In *Cox* v. *Hickman* (and in other cases) there was a difference of
opinion as to the construction of an assignment of property to trustees for the benefit of creditors, which provided for the continuance
of the debtor's business, and the appropriation of the profits to the
payment of creditors. The question, Who were the principals in the
continued business? was rendered difficult by the complicated nature of
the assignment. Whether the final decision of that question of construction was right or wrong, is not material in the present case. The
same question would have arisen under the sharing-profits test. By
the true construction of the assignment, were the profits to be received
by the creditor as creditors, or as joint principals and partners in the
continued business? The insertion of the word " profits" in the
question does not cause the difficulty of the question to vanish.

Lord CRANWORTH said a right to participate in profits, " no doubt, is
in general a sufficiently accurate test; for, a right to participate in
profits affords cogent, often conclusive, evidence that the trade in
which the profits have been made was carried on in part for, or on behalf of, the person setting up such a claim." *Cox* v. *Hickman,* 9 C. B.
(N. S.) 92. By a " sufficiently accurate test," he meant satisfactory
evidence. His remark suggests how easily a piece of evidence could
be transformed into a legal test *sub modo,* by tribunals accustomed, as
English courts are, to declare their judgment on questions of fact.
When Lord CRANWORTH said sharing-profits affords cogent evidence of

a partnership, he expressed his opinion on a question of fact; and the evident soundness of such an opinion tends to obliterate the distinction between the law and the fact of the subject. Sharing-profits, in the absence of all other evidence, would, as a matter of fact, be cogent evidence of a partnership; but every item of cogent evidence is not a legal test: moreover, it is generally impossible to have no other evidence in a case than sharing-profits: whether it is cogent or weak, depends upon its character explained by other circumstances: in this jurisdiction, the judge does not give the jury his opinion of the strength of the evidence.

"A partnership, in which the entire profit was to belong to some of them in exclusion of others, would be manifestly unjust; and, as between the parties themselves, it would not be a proper partnership. It would be what the Roman lawyers called *societas leonina*, in allusion to the fable of the lion, who, having entered into a partnership with the other animals of the forest, in hunting, appropriated to himself all the prey." 3 Kent Com. 29; Story on Part., sec. 18. This is civil law doctrine: it relates wholly to the force, effect, and validity of partnership *inter sese*, and has no reference to the rights of third persons. If it were a doctrine of the common law, it would go to show that the contract of a *societas leonina* is void *inter sese*, and not that the parties are liable to third persons. But it is not to be admitted, without deliberation, that there is any such doctrine in the common law. "It may be said, says Mr. Baron BRAMWELL, in *Bullen* v. *Sharp*, L. R. 1 C. P. 126, 127, "that, if this reasoning is right, a man might bargain to receive all the profits of a business, and not be liable. The answer is, the thing is impossible. There never was, and never will be, a *bona fide* agreement by one man to carry on a business, bear all its losses, and pay over all its profits. Should such an agreement appear, it would obviously be colourable." Suppose a New Hampshire merchant, having gained a sufficient estate in trade, and desiring to continue his business for the industrial and charitable purpose of supporting a missionary in Ceylon, gives him a bond to pay him all the future profits of his business; and suppose the profits are called "net profits" in the bond: was there ever a court that would hold the missionary liable as a partner for the goods bought by the merchant in carrying on his business? It would be evident that they both understood the missionary to be a creditor and not a partner; that, by "net profits," they meant the surplus of gross profits left after paying all other creditors of the business; and that, in the literal sense, there would be no net profits of the business. Why should the missionary be liable, especially seeing he was not to defraud the other creditors, but only to receive the balance of profits left after they were all paid?

The result of this examination of the authorities is, that the instructions given to the jury, in the present case, were erroneous. There is a provision in the reserved case, that, if there is error in the instructions as to the effect of a division of the gross receipts, judgment is to

be rendered for Stillings. But the mistrial seems to have been such that the verdict ought to be set aside, and a new trial granted.

SARGENT, C. J., FOSTER and LADD, J. J., concurring, a new trial was granted.